**Robert E. BEITZELL, Plaintiff, Appellant,**

v.

**William H. JEFFREY, etc. et al., Defendants, Appellees.**

No. 80–1395.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1981.

Decided March 6, 1981.

Jeremiah A. Collins, Washington, D. C., with whom Michael H. Gottesman, Robert M. Weinberg, Bredhoff, Gottesman, Cohen, Chanin, Weinberg & Petramalo, David Rubin, Washington, D. C., Frank G. Chapman and Locke, Campbell & Chapman, Augusta, Maine, were on brief, for plaintiff-appellant.

Clark P. Thompson, Bangor, Maine, with whom Michael P. Friedman, Frank T. McGuire, Rudman & Winchell, Bangor, Maine, George M. Shur and Bernstein, Shur, Sawyer & Nelson, Portland, Maine, were on brief, for defendants, appellees.

Before CAMPBELL and BREYER, Circuit Judges, and WYZANSKI, Senior District Judge.[*]

BREYER, Circuit Judge.

Plaintiff, Robert E. Beitzell, an assistant professor at the University of Maine at Orono (UMO), a state university, was denied an appointment at the university with tenure. He brought this civil rights action under 42 U.S.C. § 1983 against UMO officials in the United States District Court for the District of Maine. He claimed that, in denying him tenure, the university deprived him of "liberty" and "property" without "due process of law". After a hearing the district court found there had been no such denial of Fourteenth Amendment rights and entered judgment for defendants. We affirm.

## I.

The facts of this case are set forth clearly and in detail in the opinion of the district court. In summary form they are as follows: After teaching as an instructor at the University of Massachusetts, Beitzell accepted a one-year appointment as an assistant professor of history at UMO in 1967. He was reappointed as an assistant professor in 1968, and again in 1970. He was first considered for a permanent "tenured" appointment by the history department's "Policy Advisory Committee" (PAC) in November, 1971.

The PAC consisted of several tenured members of the history department, including its chairman, William Jeffrey. In the normal course of events, the PAC would recommend to the department chairman whether or not a faculty member should be

---

granted tenure. In principle, the department chairman would decide whether or not to accept the recommendation. In practice, an unfavorable PAC recommendation was almost always followed by a denial of tenure. A favorable PAC recommendation, however, might still be reversed by the chairman, or someone higher in the university chain of command, such as the dean of the college, the vice-president for academic affairs or the university president. The procedures for awarding tenure at UMO, some of which are set out in the faculty handbook, generally follow those recommended by the American Association of University Professors, and are typical of procedures followed at numerous universities.[1] In October, 1971, the history department supplemented the handbook by publishing an explicit statement of its "Criteria for Promotion and Tenure". These criteria consist of classical tenure requirements: a mixture of scholarship, teaching and service.[2] Scholarship was essentially defined as "significant publication", teaching as "satisfactory classroom performance", and "service" as "significant contributing membership" on university or professional committees.

Beitzell's tenure case in 1971 was controversial. There is evidence that Jeffrey, the department chairman, felt that Beitzell was unstable and that Jeffrey repeated to various faculty members rumors that Beitzell drank too much. The district court found, however, that Jeffrey made a fair presentation to the PAC of Beitzell's professional qualifications for tenure. When the subject of Beitzell's drinking arose at the meeting, Jeffrey ruled it out of order and prevented further comment. At the end of a "free-wheeling" discussion, the PAC members voted unanimously against a tenure recommendation. Jeffrey, in his role as depart-

ment head, accepted the negative recommendation and informed Beitzell of his decision. On an official personnel form (which was delayed in transmission to Beitzell for a year) Jeffrey wrote that Beitzell "had not lived up to his promise as a scholar", was "a less than adequate teacher", and "as advisor, he has been totally inadequate".

Beitzell was again considered for tenure in the Fall of 1972. By that time, Beitzell's book had been accepted for publication by a prestigious publisher. Galleys were made available to the PAC, as were summaries of interviews with students, largely favorable to Beitzell. Jeffrey invited Beitzell to a meeting of the PAC to make his own case, but Beitzell declined. Instead, Jeffrey made the presentation on his behalf—a presentation described as "bland", but without offensive remarks. The district court found that all "relevant information supportive of plaintiff's application for tenure was accumulated in advance of the meeting and was available for inspection by members of the committee". The PAC again recommended that the chairman deny Beitzell tenure, this time by a vote of 7 to 6, with Jeffrey abstaining.

Beitzell then hired a lawyer. He sought review of the history department's decision by a Faculty Professional Relations Committee (FPRC)—empowered to hear faculty grievances, to conciliate, and to make recommendations. The FPRC met with Beitzell, then with Jeffrey and others. After discussing the PAC decision in detail, Jeffrey made available to the FPRC a two and one-half page document he had prepared as a basis for his appearance before it. That document was very critical of Beitzell, it detailed behavior which it described as "irresponsible", it cast doubt on whether Beitzell's improved performance would contin-

---

1. See AAUP, "1968 Recommended Institutional Regulations on Academic Freedom and Tenure", *AAUP Bulletin*, (Winter 1968); AAUP, "Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments", *Policy Documents and Reports* 8 (1977). These recommendations and procedures are derived from AAUP, "1940 Statement

of Principles and Interpretive Comments", *Policy Documents and Reports*, *supra*, at 1, the most widely accepted plan for tenure acquisition in the United States. See H. Edwards and V. Nordin, *Higher Education and the Law* 226 (1979).

2. See n.12, *infra*.

ue, and it repeated allegations made by others that Beitzell drank too much. Beitzell met again with the FPRC to rebut some of the charges made against him, but the FPRC did not disclose all of the derogatory claims made by Jeffrey or others. The FPRC concurred in the decision of the PAC.

Beitzell next invoked a new, more formal, grievance procedure, which UMO had just created. Acting under this procedure, the UMO president created a special ad hoc board to hear Beitzell's grievance and make a recommendation. The Grievance Board held a hearing, with lawyers present, during which both Beitzell and representatives of the University were allowed to present testimony and documentary evidence and to cross-examine witnesses. Jeffrey testified and, after he made some references to the document he had used before the FPRC, Beitzell's counsel asked that it be placed in the record. Despite efforts to keep the proceedings confidential, word of Jeffrey's criticisms spread on the campus. The Grievance Committee eventually recommended that the PAC give Beitzell further consideration, particularly in respect to the quality of his book and his teaching. And, the Committee criticized Jeffrey, claiming that his FPRC testimony and the document he prepared were professionally speaking "unethical".

The UMO president then asked the PAC whether it felt it should reopen Beitzell's case. The PAC responded that its hearing had been fair and that it was up to the president to decide whether to reopen. Jeffrey evidently told the president the PAC opposed reopening, and the president wrote Beitzell, denied his request for reopening and affirmed that Beitzell's probationary appointment expired in the summer of 1973. Then, after learning that the PAC actually had not decided whether to reopen, the president gave Beitzell an extension of his appointment through the Fall and told the PAC to decide whether to reopen the case. The PAC voted 12 to 2 not to reopen; the decision was affirmed by a new UMO president; Beitzell exhausted all his internal appeals, and he then filed this lawsuit.

After trial, the district court found that Beitzell had not been deprived of "liberty" or "property" without "due process of law", within the terms of the Fourteenth Amendment. The court found that Beitzell had no protected "liberty" interest: any injury to his reputation was not caused by "University officials in connection with the non-renewal of his contract". While the court found that Beitzell had a "property" interest, it held that he had received all the "process" that was "due", for he received notice, an opportunity to submit to the PAC any information he considered appropriate, the right to present his case to the PAC personally, the right to be evaluated under the history department criteria, and a statement of reasons for denial of tenure.

Beitzell, on appeal, contends that the University, in making public "false and stigmatizing" charges against him without a proper hearing, deprived him of "liberty" without "due process of law". He also claims that procedural protections UMO accorded him were constitutionally inadequate to protect his "property interest" in tenure.

## II.

We first take up the question of whether Beitzell had a constitutionally protected "property" interest in tenure.[3] At least since 1970, the Fourteenth Amendment term "property" has referred not simply to "actual ownership of real estate, chattels, or money", but also to "interests that a person has already acquired in specific [governmental] benefits". *Board of Regents v. Roth*, 408 U.S. 564, 572, 576, 92 S.Ct. 2701, 2706, 2708, 33 L.Ed.2d 548

3. UMO has not pressed on appeal the district court's finding that Beitzell had a protected "property" interest. UMO has not conceded the existence of such an interest, however. It challenged this matter in the district court, where both parties briefed the question. In light of the fact that a determination of the dimensions of due process is initially dependent on a finding and assessment of the alleged property interest, *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and the desirability of clarity on the issue, this court will consider whether Beitzell has established a property claim.

(1972); *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). As so interpreted, Fourteenth Amendment protections previously given land owners are provided as well to many others who depend heavily upon the continued availability of, for example, welfare,[4] social security,[5] or government employment.[6]

The broadening of the term "property" to include this "new property",[7] has required the courts to determine when an interest in a government benefit rises to the level of protected "property". The Supreme Court has made clear that the answer depends in large part upon the extent to which a person has been made secure in the enjoyment of the benefit as a matter of substantive state or federal law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Paul v. Davis*, 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 366 (1976); *Board of Regents v. Roth, supra*, 408 U.S. at 577, 92 S.Ct. at 2709; *Hagopian v. Trefrey*, 639 F.2d 52, 53 (1st Cir. 1981). The greater the interest and protection accorded an interest by such substantive law, the more reasonable is the holder in expecting to continue to enjoy it and in making decisions in reliance upon that expectation, and the less reasonable it is for the state to interfere directly with that enjoyment without according a fair opportunity to the holder to contest that interference. Thus, in *Roth*, the Supreme Court stated that for an interest in a benefit to become a "property" interest, a person

> . . . must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. 408 U.S. at 577, 92 S.Ct. at 2709.

*See also, Perry v. Sindermann, supra*, 408 U.S. at 601, 92 S.Ct. at 2699; *Bishop v. Wood, supra*, 426 U.S. at 344–47, 96 S.Ct. at 2077–2078; *Needleman v. Bohlen*, 602 F.2d 1, 4 (1st Cir. 1979). While these decisions provide no perfect touchstone for identifying "property", they suggest that the more circumscribed is the government's discretion (under substantive state or federal law) to withhold a benefit, the more likely that benefit constitutes "property", *cf. Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977), for the more reasonable is reliance upon its continued availability and the more likely it is that a hearing will illuminate the appropriateness of withholding it in an individual case.

■ Thus, in the area of government employment, a person who holds a job from which he can be removed only "for cause", has a protected property interest, while one who can be removed "at will" does not. *Bishop v. Wood, supra*, 426 U.S. at 344–47, 96 S.Ct. at 2077–2078. In the former case, the government's power to remove is seriously circumscribed; the person is likely to rely reasonably on remaining employed; and a hearing is likely to help determine whether cause exists. In the latter type of case, the opposite tends to be true. It is not surprising that in *Sindermann*, the Court held that when a university, without a formal tenure system, led a teacher reasonably to believe that he was a permanent employee, he held a protected property interest. But, in *Roth*, the Court held that a university teacher hired as a probationary employee without tenure held no protected property interest.

---

**4.** *Goldberg v. Kelly, supra*, 397 U.S. at 261–62, 90 S.Ct. at 1016–1017.

**5.** *Mathews v. Eldridge, supra*, 424 U.S. at 332, 96 S.Ct. at 901.

**6.** *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**7.** *See*, Reich, "The New Property", 73 *Yale L.J.* 733 (1964); Monaghan, "Of 'Liberty' and 'Property' ", 62 *Cornell L.Rev.* 405 (1977); Van Alstyne, "Cracks In 'The New Property' Adjudicative Due Process in the Administrative State", 62 *Cornell L.Rev.* 445 (1977).

Neither is it surprising that every court that we have found to have considered the matter has held that, in the absence of unusual circumstances, a probationary university employee has no "property" interest in obtaining tenure. *See, e. g., Citron v. Jackson State University,* 456 F.Supp. 3 (S.D.Miss.1977), *aff'd mem.,* 577 F.2d 1132 (5th Cir. 1978); *Cusumano v. Ratchford,* 507 F.2d 980, 982, 987 (8th Cir. 1974); *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1355 (W.D.Pa.1977); *Tyler v. College of William and Mary,* 429 F.Supp. 29 (E.D.Va.1977); *Keddie v. Pennsylvania State University,* 412 F.Supp. 1264 (M.D.Pa.1976); *Perkins v. Regents of California,* 353 F.Supp. 618 (C.D.Cal.1973). Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts.[8] This security and the freedom of expression it allows, arguably help the university carry out a basic function—the vigorous exchange of ideas—a function that itself enjoys constitutional protection. *See Healy v. James,* 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1970); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957). Given the university's overall mission, the creation and transmission of knowledge, the very need for strong procedural protections to prevent the wrongful dismissal of a tenured teacher concomitantly suggests a need for wide discretion in making an initial tenure award. Only at the initial tenure stage can the university look primarily to the interests of the students, of the discipline, and of its own administrative needs. As other courts have suggested, the initial decision to grant tenure, like various other academic matters, typically calls for the exercise of subjective judgment, confidential deliberation, and personal knowledge of both the candidate and the university community. *See, e. g., Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 176 (1st Cir.), *vacated and remanded on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Citron v. Jackson State University, supra,* 456 F.Supp. at 14; *Stebbins v. Weaver,* 537 F.2d 939, 943 n.2 (7th Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir. 1974); *Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1346. The determination does not call for the use of adversarial procedures, *cf. Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 88–90, 98 S.Ct. 948, 954, 55 L.Ed.2d 124 (1978), which are at the core of judicial notions of due process. These facts suggest why it would be objectively unreasonable for a probationary teacher to rely upon an award of tenure. *Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1355. And, they suggest the inappropriateness of courts determining what procedures universities ought to follow in making initial tenure awards.[9]

---

8. Courts have frequently found this to be the case. *See, e. g., Huang v. College of the Holy Cross,* 436 F.Supp. 639, 653 (D.Mass.1977); *Labat v. Board of Higher Ed. of City of New York,* 401 F.Supp. 753, 756 (S.D.N.Y.1975). The Commission on Academic Tenure in Higher Education defines tenure as: "[A]n arrangement under which faculty appointments in an institution of higher education are continued until retirement for age or disability, subject to *dismissal* for *adequate cause* or unavoidable termination on account of financial exigency or change of institutional program." Commission on Academic Tenure in Higher Education, *Faculty Tenure: A Report and Recommendations* 256 (1973) (emphasis in original). [hereinafter *Faculty Tenure*]. For discussions on tenure, see *Faculty Tenure, supra,* at 1–2; B. Shaw, *Academic Tenure in American Higher Education* (1971); *Academic Freedom and Tenure* (L. Joughin ed. 1969); C. Byse and L. Joughin, *Tenure in American Higher Education: Plans, Practices and the Law* (1959); Yurko, "Judicial Recognition of Academic Collective Interests: A New Approach to Faculty Title VII Litigation", 60 *B.U.L.Rev.* 473 (1980); Brown, "Tenure Rights in Contractual and Constitutional Context", 6 *J.Law & Ed.* 280 (1977); Van Alstyne, "Tenure: A Summary, Explanation, and 'Defense' ", 57 *AAUP* Bull. 328 (1971).

9. Even if, as here, the trial court determines that the procedures required by the "due process" clause are minimal, the very fact of court supervision encourages a proliferation of procedural arguments on the campus as disap-

These cases and principles indicate that Beitzell had no protected "property" interest in obtaining tenure at UMO. The record makes clear that tenure at UMO does not differ significantly from tenure elsewhere. The UMO handbook points out that tenure is not granted as of right, but, rather, it is a permanent status provided after careful evaluation at both departmental and administrative levels. Beitzell was hired as a probationary employee. And, at UMO many probationary employees were not given tenure.[10] The district court based its finding of a property "entitlement" upon the fact that the UMO history department promulgated criteria for a tenure award. But those criteria did not set objective standards conferring an automatic right to tenure, nor did they create a reasonable expectation of receiving it.[11] Rather, they simply reiterated the traditional criteria for promotion at universities: teaching, scholarship, and service.[12] The government often promulgates criteria for selecting among applications for a particular job, but that fact alone does not create an automatic right in the applicant to the job, nor does it create an entitlement, or a property interest, in a job not yet possessed. Aside from the mere existence of these criteria, there is not a word in the record suggesting that UMO's "tenure" was meant to be granted routinely or to be withheld only for "cause", nor is there a word suggesting that the tenure procedure was meant to be less judgmental or subjective than elsewhere.[13]

In addition to the history department criteria, Beitzell advanced two other grounds in his complaint to support his claim that UMO's tenure procedure created a property right. First, he contended that UMO automatically granted tenure after seven years of service; and, he stated that he had such service because his previous service at the University of Massachusetts should have been counted as part of the seven years under Section 3.3521[14] of

pointed candidates seek to obtain appointments by transforming their substantive arguments into procedural ones.

10. *See* the testimony of History Professor John Nolde, Chairman Jeffrey, and letter from History Professor Alice Stewart to Jeffrey dated December 7, 1972 (Exhibit 27). There is nothing in the record to support a claim of "common law" of re-employment or automatic tenure at the UMO history department. *See Keddie v. Pennsylvania State University, supra,* 412 F.Supp. at 1273. Nor is any such claim made.

11. *See Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1355.

12. *See, e. g.,* the criteria used in *Green v. Board of Regents of Texas Tech University,* 474 F.2d 594, 595 (5th Cir. 1973); *Scott v. University of Delaware,* 455 F.Supp. 1102, 1107 (D.Del.1978), modified, 601 F.2d 76 (3rd Cir.), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Huang v. College of the Holy Cross, supra,* 436 F.Supp. at 642; *Johnson v. University of Pittsburgh, supra,* 435 F.Supp. at 1340; *Cussler v. University of Maryland,* 430 F.Supp. 602, 604 (D.Md.1977); *Labat v. Board of Higher Ed. of City of New York, supra,* 401 F.Supp. at 755. Sometimes the three criteria are further subdivided. *See, e. g., Citron v. Jackson State University, supra,* 456 F.Supp. at 13; *Peters v. Middlebury College,* 409 F.Supp. 857, 864, 867 (D.Vt.1976); *Keddie v. Pennsylvania State University, supra,* 412 F.Supp. at 1268;

and *EEOC v. Tufts Inst. of Learning,* 421 F.Supp. 152, 160 (D.Mass.1975).

Depending on their needs, universities and colleges may give different weight to any of the criteria. Thus, for one school, publications and scholarship may be of prime importance, *Cussler v. University of Maryland, supra,* 430 F.Supp. at 604, 606; for another, teaching may be particularly essential, *Peters v. Middlebury College, supra,* 409 F.Supp. at 858, 867.

13. We note that we do not deal here with any allegations that UMO's actions were based upon some constitutionally impermissible ground, such as racial, religious or sexual discrimination, or retaliation for assertion of rights guaranteed by law or the Constitution. *See Frazier v. Curators of University of Missouri,* 495 F.2d 1149, 1153 (8th Cir. 1974).

14. Section 3.3521 provides:
"Probationary Status
No member of the faculty with instructor or professorial rank may be held in a probationary status at the University of Maine for more than seven years. If a new appointee has had full-time teaching experience at other institutions of higher education at the rank of instructor or above, three of those years, depending on the nature of the experience, *may* be counted as part of the probationary period, in which case the probationary period at the University of Maine would not exceed four years. The duration of the probationary

UMO's regulations. The ·district court properly rejected this argument, pointing out that the regulation said that up to three years elsewhere "may" be counted, not that it *must* be.[15] Second, Beitzell claimed that former Department Chairman Seager had written in letters of recommendation that "it is my intention to promote . . . [Beitzell] to a tenured position . . . when his book is published". The court reasonably found, however, that these letters were insufficient to create a reasonable expectation of tenure, *see McElearney v. University of Ill., Etc.*, 612 F.2d 285, 290 (7th Cir. 1979); *Stebbins v. Weaver, supra*, 537 F.2d at 943; *Haimowitz v. University of Nevada*, 579 F.2d 526, 528 (9th Cir. 1978), and Beitzell's later actions in preparing for PAC consideration suggest that he had no such expectation.

In the absence of unusual circumstances, where a formal tenure system exists, that system confers no "property" interest on probationary employees. *Haimowitz v. University of Nevada, supra*, 579 F.2d at 528; *see also Needleman v. Bohlen, supra*, 602 F.2d at 4; *Willens v. University of Massachusetts*, 570 F.2d 403, 405 (1st Cir. 1978). It would take highly unusual circumstances to show that plaintiff had been granted *de facto* tenure. No such circumstance is present here. Thus, Beitzell had no protected "property" interest. We need not then consider whether he received the process that was "due". *Burns v. Sullivan*, 619 F.2d 99, 104–05 (1st Cir. 1980).

### III.

We believe that the district court was correct in holding that Beitzell failed to show he was deprived of any constitutionally protected "liberty". The definition of the term "liberty", provided procedural protection by the Fourteenth Amendment, has expanded well beyond its common law core, "the power of locomotion . . . without imprisonment or restraint", W. Blackstone, *Commentaries on the Law of England: Of the Rights of Persons* *134, and includes other fundamental freedoms. In certain circumstances, the list of fundamental liberties accorded procedural protection includes an interest in reputation—at least where the injury to reputation is likely to be sufficiently severe to interfere with the exercise of other fundamental freedoms such as those described in *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), as the right "to engage in any of the common occupations of life," or "to marry, to establish a home and bring up children". Thus, in *Roth*, the Court, after referring to *Meyer*, suggested that the Fourteenth Amendment offers protection against a severely defamatory charge, such as a claim of "dishonesty or immorality" that might "seriously damage" one's "standing and associations in his community" or impose a "stigma" that significantly interfered with his ability to "take advantage of other employment opportunities".

period shall be established *in writing* at the time of initial appointment.

The possible seven-year probationary period shall in no way prevent the granting of tenure in a shorter period if the performance of an individual justifies such action." (Emphasis added.)
It should be noted that the object of the regulation is not necessarily to grant "automatic" tenure, but rather to make certain a tenure decision is made in time to allow the teacher, if necessary, to find employment elsewhere.

15. Beitzell also argued that the recommended AAUP regulations contained in the appendix of the Handbook of Information for the Faculty were incorporated by reference in a section of the UMO regulations, and overrode any contrary provisions contained in Section 3.3521. These AAUP recommendations would require

mandatory credit for prior full-time service at other institutions.

It was reasonable for the district judge to find that it was *manifestly not the intent of the drafters* of the UMO regulations to incorporate the proposed AAUP regulations by reference, nor was it their intention that those recommendations prevail over *the clear meaning of the language* of the actual UMO regulations with respect to tenure. As the court observed, "testimony at trial established that the practice at the University was to provide no credit for prior full-time teaching service unless the terms of such credit were agreed upon in writing at the commencement of employment". Beitzell conceded that, at the time of his initial employment at UMO, he did not believe that he was getting any credit for his service at the University of Massachusetts.

And, the Court cited a series of cases, arising principally during the 1950's, where the charges made, of "subversive activities", were likely to have had just so serious an effect.[16] *Board of Regents v. Roth, supra,* 408 U.S. at 573 n.12, 92 S.Ct. at 2707.

■ In *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), the Supreme Court, making clear that the Fourteenth Amendment "liberty" does not include *all* interests protected by state tort law, held that it does not grant procedural protection to reputation alone, "apart from some more tangible interests such as employment". Rather, the injury to reputation must be accompanied by a change in the injured person's status or rights (under substantive state or federal law),[17] perhaps as a touchstone (or concrete evidence) of the fact that the injury to reputation was inflicted as a result of a conscious government policy and is serious enough to interfere with other liberties of the sort suggested in *Meyer.* The Court has not interpreted the requirement of change in "rights" or "status" technically, for it has found the requisite change of status in the termination of government employment held at will. *Owen v. City of Independence,* 445 U.S. 622, 633 n.13, 100 S.Ct. 1398, 1406 n.13, 63 L.Ed.2d 673 (1980). Thus, the cases suggest there is a core interest in reputation which is protected from interference by individualized government action; the Fourteenth Amendment procedurally protects reputation only where (1) government action threatens it, (2) with unusually serious harm, (3) as evidenced by the fact that

employment (or some other right or status)[18] is affected. *See also Rodriguez de Quinonez v. Perez,* 596 F.2d 486, 488–489 (1st Cir. 1979).

■ Under these standards, Beitzell has not made out a claim of injury to a constitutionally protected interest. Beitzell cannot claim injury to a constitutionally protected interest in reputation prior to the time he invoked the University's grievance procedure. The fact that the PAC recommended that he not be retained does not injure his reputation sufficiently. *Board of Regents v. Roth, supra,* 408 U.S. at 573–75, 92 S.Ct. at 2707–2708. In the words of *Roth,* "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another". 408 U.S. at 575, 92 S.Ct. at 2708. Nor does the discussion of Beitzell's tenure credentials—whether he is an adequate teacher, scholar, member of the university community—threaten his reputation insofar as it is constitutionally protected. Such discussions accompany many, if not all, decisions to hire, or to promote, as well as to discharge, an employee, and they threaten no special injury. *Willens v. University of Massachusetts, supra,* 570 F.2d at 406; *Ventetoulo v. Burke,* 596 F.2d 476 (1st Cir. 1979). Beitzell claims that, during this time, Jeffrey circulated rumors about his drinking habits. But in the district court's view, Beitzell failed to show that these rumors became public, that they were made available to other employers or that they interfered with his ability to obtain other employment.

---

16. *Weiman v. Updegraff,* 344 U.S. 183, 191 (1952); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); *United States v. Lovett,* 328 U.S. 303, 316–317, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946); *Peters v. Hobby,* 349 U.S. 331, 352, 75 S.Ct. 790, 800, 99 L.Ed. 1129 (Douglas, J. concurring) (1955).

17. *See Paul v. Davis, supra,* 424 U.S. at 706, 708, 710, 96 S.Ct. at 1163, 1164, 1164.

18. *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 215 (1971) (defamation plus denial of freedom to buy liquor within city limits). Other evidence of the seriousness of government threat of harm to reputation—

apart from effect on employment (or some other right or status)—may be found in the nature of the government action itself. *Compare Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (defamation by state agency performing solely or predominantly accusatory function denies due process) *with Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (defamation by purely investigatory agency not making affirmative determinations of criminal culpability held not to deny due process absent effect on other right or status). *See Paul v. Davis, supra,* 424 U.S. at 701, 706, 709–710, 96 S.Ct. at 1160, 1163, 1164.

And, the record supports the finding of the district court.

Beitzell also claims that the charges contained in Jeffrey's memo, such as excessive drinking, were defamatory and that their circulation on campus after the meeting of the Grievance Committee infringed a protected "liberty" interest. Whether or not the Grievance Committee meeting is sufficiently related to employment termination to satisfy *Paul*,[19] the University did not infringe any constitutionally protected interest in Beitzell's reputation. Such infringement has been found when the state has made seriously defamatory charges in public, for example, at public meetings or to the press. *See, e. g., Owen v. City of Independence*, 560 F.2d 925, 936–37 (8th Cir. 1977), *vacated and remanded on other grounds*, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978), *reaffirmed in pertinent part on other grounds*, 589 F.2d 335 (8th Cir. 1978), *rev'd on other grounds*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).[20] The fact that the statements are made in the form of *charges* by the government tends to lend them authority and credibility so that they stigmatize and the fact that they are made in public makes interference with future employment opportunities likely. E. Goffman, *Stigma* (1963); Note, "Reputation, Stigma and Section 1983: The Lessons of *Paul v. Davis*," 30 *Stan.L.Rev.* 191, 224 n.187, 226 n.195 (1977). In this instance, no such charge was made; rather, Jeffrey's views on Beitzell's drinking became known to the Grievance Committee as a result of Beitzell's attorney asking that the memo be placed in the record. The meeting was in private, and there is no evidence that University officials were responsible for spreading the information on campus. Any information spread on campus was the result apparently of unauthorized "leaks". In terms of likely stigmatizing effect, there is obviously a world of difference between official charges (say, of excessive drinking) made publicly and a campus rumor based upon hearsay extracted from one witness by Beitzell's attorney at a closed meeting. The district court reasonably found that any disclosure did not occur as a result of charges brought by University officials in connection with the nonrenewal of his contract. It also found that Beitzell failed to establish that Jeffrey's memorandum significantly interfered with his ability to find future employment—a finding equally well supported in the record.

■ In any event, even were there a protected "liberty" interest at stake—and we believe there is not—we would also uphold the district court's decision that Beitzell received the process that was his due. The cases make clear that, when a constitutionally protected interest in reputation is at stake, the Fourteenth Amendment requires a proceeding at which plaintiff has an opportunity to clear his name. *Board of Regents v. Roth, supra*, 408 U.S. at 573 n.12, 92 S.Ct. at 2707 n.12; *Paul v. Davis, supra*, 424 U.S. at 709, 96 S.Ct. at 1164; *Owen v. City of Independence, supra*, 445 U.S. at 633 n.13, 100 S.Ct. at 1406 n.13. Beitzell was given just such an opportunity by the Grievance Committee. He had his lawyer present and was offered the opportunity to present, and to cross-examine, witnesses. He thus could have rebutted Jeffrey's statements, correcting misstatements, had he wished to do so.

In sum, in failing to provide Beitzell with tenure, UMO did not deprive him of "property" within the meaning of the Fourteenth

---

19. 424 U.S. at 710, 96 S.Ct. at 1164. The Grievance Committee lacked the power to grant or to deny tenure or even to make recommendations on that subject. It could only suggest reconsideration by the President or the PAC.

20. *See also Staton v. Mayes*, 552 F.2d 908, 911 n.6 (10th Cir.), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977) (public meeting with representatives of press present); *Huntley v. Community School Board of Brooklyn*, 543 F.2d 979, 983 (2d Cir. 1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977) (public meeting); *David Gonzalez v. Calero*, 440 F.Supp. 989, 996 (D.P.R.1977) (newspaper publicity); *Galaway v. Lawson*, 438 F.Supp. 968, 974 (D.Minn.1976), *aff'd per curiam*, 565 F.2d 542 (8th Cir. 1977) (newspaper publicity).

Amendment. And, it did not, during the tenure proceedings, interfere with any protected interests in "liberty". Therefore, the judgment of the district court is

*Affirmed.*