LaForge v. Howard, Town of Hooksett   CV-00-437-JD   04/30/02
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Patrick LaForge

        v.                              Civil No. 00-437-JD
                                        Opinion No. 2002 DNH 088
Michael J. Howard, in his
Individual and Official Capacities,
and the Town of Hooksett


                            O R D E R


    The plaintiff, Patrick LaForge, brings an action against his

former employer, the Town of Hooksett Fire Department, and Fire

Chief Michael J. Howard, arising from the circumstances

surrounding his resignation from the Hooksett Fire Department.

LaForge brings two claims under 42 U.S.C. § 1983, alleging that

the defendants violated his constitutional rights under the First

and Fourteenth Amendments, and four state claims, alleging

defamation, intentional interference with contractual relations,

malicious prosecution, and wrongful termination.  The defendants

move for summary judgment.  LaForge objects.


                        Standard of Review

    Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996).

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. See Davila-Perez v. Lockheed Martin Corp., 202 F.3d 464, 466 (1st Cir. 2000). The moving party must demonstrate the absence of genuine issues of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the motion is properly supported, the nonmoving party then must set forth facts showing that a genuine issue of material fact exists. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).


## Background

Patrick LaForge was employed by the Hooksett Fire Department ("HFD") in 1992 as a part-time firefighter and became a full-time employee in 1993. In 1998 LaForge was certified as a paramedic and began working in that capacity for the HFD. After earning

2

his paramedic certification, LaForge began seeking employment elsewhere, to enhance his professional development. At that time the HFD emergency service was supplemented by Tri-Town Volunteer Emergency Ambulance Service ("Tri-Town"), which provided advanced life support services. Both the HFD and Tri-Town responded to emergency calls.

In June of 1999, LaForge applied for a position with the Concord Fire Department ("CFD"). As part of the application process, LaForge authorized the CFD to conduct a background check. The CFD extended a verbal offer of employment to LaForge and the CFD Division Commander, Christopher Pope, wrote LaForge on July 30, confirming the offer. The letter stated: "This will serve to confirm our verbal employment offer to you for the position of firefighter/paramedic and your acceptance of the same. . . . Please report to our headquarters, 35 Green St., at 0800 hours, Friday, August 13, 1999."

LaForge tendered his resignation to the HFD on August 2 and gave notice that his last shift would be August 14, 1999. LaForge submitted his letter of resignation to Chief Howard, who initialed it as received, and LaForge, Chief Howard, and Deputy Chief Gary Lambert discussed LaForge's reasons for leaving the

HFD.[1] At that time, Chief Howard had been with the HFD for two months. During this meeting, Chief Howard inquired into LaForge's reasons for leaving the HFD. LaForge indicated that he felt that ranking officers demonstrated preferential treatment when determining shift assignments and other departmental matters. He also expressed his opposition to the suggestion that the HFD might assume full EMS ambulance service for the Town of Hooksett ("Hooksett"), independent of Tri-Town. Although Hooksett had not yet established a formal proposal for a town-operated ambulance service, the idea had been discussed for some time. LaForge shared with Chief Howard his concerns that the HFD was not prepared to effectively handle full EMS services in the community. Lambert expressed his disagreement with LaForge's view.

LaForge returned home and discussed the meeting and his concerns about HFD assuming ambulance services with his girlfriend, Anita Lombardo, an employee of Tri-Town. Lombardo suggested he bring specific examples to Chief Howard to illustrate his concerns. On August 5, Lombardo told LaForge

---

[1] Chief Howard testifies in his deposition that he believes he submitted LaForge's resignation to the town administrator's office the next day, August 3, 1999. Nothing in the record indicates when a resignation becomes official, however the parties do not dispute that the resignation LaForge tendered on August 2 was binding.

4

about an emergency call by the HFD that was not conducted according to procedure. LaForge and Lombardo agreed that she would attempt to secure a copy of the "run form" for that call (run forms report the actions taken on emergency calls). Anita went through the Tri-Town chain of command and supplied LaForge with a copy of the run form for the call. The form showed that the HFD member who participated in the call and filled out the form failed to do so according to procedure. In some places, the form had been marked with black, although the parties dispute the effectiveness of that attempted redaction.[2]

On August 6, LaForge met with his supervising officer, Lieutenant Mark Hurley, and showed him the run form. Lt. Hurley acknowledged that it was not filled out correctly and agreed to go with LaForge to show it to Chief Howard. When Lt. Hurley and LaForge stopped by Chief Howard's office that day, however, Chief Howard was not present. Lt. Hurley did not give LaForge express permission to speak with Chief Howard on his own.

Later that day LaForge encountered Chief Howard outside Fire Station One. LaForge approached Chief Howard and asked if he could speak with him. Although Chief Howard did not answer, he

_____

[2] A copy of the run form, submitted by LaForge, shows blackened areas over portions of the form. The patient's name is not visible on the copy of the form that is in the record.

5

stopped walking and began listening to LaForge. LaForge showed Chief Howard the run form and expressed his concerns about HFD's ability to assume responsibility for EMS ambulance services. According to LaForge, he spoke for about eight minutes. Chief Howard states the discussion only lasted about ninety seconds. Chief Howard also affirms that confidential patient information was visible on the run form despite the attempted redaction. Chief Howard did not respond to LaForge's comments. He became angry, got in his car, and left the station.

Chief Howard reflected on the encounter over the weekend, and then scheduled a meeting with Lt. Hurley for Monday, August 9. He insisted that Lt. Hurley bring union representation. Chief Howard discussed with Lt. Hurley LaForge's use of the run form, which Chief Howard believed breached patient confidentiality and was obtained improperly. Chief Howard learned from Lt. Hurley that LaForge had approached Chief Howard without Lt. Hurley's permission, which constituted a breach of HFD's chain of command. Chief Howard contacted Town Administrator Mike Farrell to report the events and arranged a meeting with LaForge and Lt. Hurley for Friday, August 13, to discuss the situation. Although Chief Howard expected that the situation would probably require discipline, he affirms he had made no decision to terminate LaForge. On August 10 Chief Howard

contacted the New Hampshire Division of Emergency Medical Services ("EMS Bureau") to clarify his understanding of the state laws governing EMS services.

At some point following submission of LaForge's resignation to the town administrator, Chief Howard became aware that LaForge's resignation, which would take effect August 14, did not provide fourteen days' notice as required by the firefighters' collective bargaining agreement. Insufficient notice would result in forfeiture of some of LaForge's benefits, such as accrued vacation pay. In an August 6 phone call and an August 10 letter, Chief Howard notified LaForge that his notice was insufficient to collect full benefits. However, Chief Howard told LaForge that he believed they could work out the start date with the CFD, so that LaForge could collect his full benefits.

On August 11 Chief Howard met with LaForge and suggested that LaForge resubmit his resignation with a termination date of August 17. Chief Howard told LaForge that he had spoken with someone at the New Hampshire Retirement System, and learned that a revised resignation effective August 17 would remedy the notice deficiency so that LaForge would collect his benefits. Chief Howard said that the CFD was agreeable to modifying LaForge's orientation schedule to accommodate his delayed start date, and he advised LaForge to finalize this arrangement with the CFD

7

immediately. LaForge met with Commander Pope at the CFD on the morning of August 11 to discuss his start date arrangements. Commander Pope agreed to the revised start date of August 17. LaForge, however, never submitted a revised resignation to the town.

After his meeting with LaForge on August 11, Commander Pope contacted Chief Howard to confirm the arrangements, and they arranged a personal meeting for that afternoon. It is disputed in the record who initiated the meeting and for what purpose, although both agree that they expected to discuss issues involving LaForge. At the meeting, Chief Howard revealed information about LaForge that the CFD had not known previously, including the run form incident and Chief Howard's inquiry to the EMS Bureau.[3] During the meeting Commander Pope and Chief Howard discussed these incidents and Chief Howard told Commander Pope that he believed LaForge had gone outside the chain of command and had breached patient confidentiality. According to Commander Pope, Chief Howard told him that he planned to discipline, and possibly terminate, LaForge on August 13. Chief Howard disputes that statement.

Commander Pope discussed LaForge's complete file with CFD

---

[3] Also present at the meeting were Deputy Chief Lambert and CFD Bureau Commander Jim Clow.

Chief Dionne and other CFD officers later that evening, and they decided to postpone hiring LaForge. Commander Pope phoned LaForge and told him that the CFD was postponing his hiring and referring the matter to their personnel department, and advised him to consider withdrawing his resignation from the HFD. On August 12, Commander Pope sent LaForge a letter stating that based on information regarding his background which they had recently discovered, they were postponing his offer of employment until the issues were resolved to their satisfaction. LaForge wrote to the town administrator on August 12 asking to withdraw his resignation, noting that he had turned down a prior job offer due to family reasons.

Chief Howard met with Farrell, his assistant Liz Dinwoodie, and HFD Deputy Chief Gary Lambert on August 12. LaForge was not given notice of the meeting. At this meeting, it was determined that LaForge would be "relieved of duty," with pay, for his remaining shifts with the HFD.[4] The defendants state that the leave was not a disciplinary measure. Farrell explained that LaForge "was raising such a ruckus in the department [over

---

[4] At times throughout his deposition testimony, Farrell uses the term "administrative leave" to describe the action taken to relieve LaForge of duty. However, neither the Hooksett personnel plan nor the HFD collective bargaining agreement provides for "administrative leave" as a personnel action, and Farrell does not define his use of the term.

Hooksett's readiness to take on ambulance service] that why go through the agony for two more days? Just pay him and be done with it." Farrell also decided not to accept LaForge's withdrawal of his resignation, but instead to "let him go to Concord and be done with it." Chief Howard attended the meeting, but he affirms that the decision to relieve LaForge of duty had been made by Farrell prior to the meeting. Farrell states that the group as a whole decided what action to take.

When LaForge arrived at the station for his scheduled shift on August 13, he was met by Lt. Hurley, Chief Howard, and Captain Landry. Chief Howard told LaForge that his withdrawal of resignation had been denied and that he was relived of duty effective that morning, upon a directive from the town administrator. He told LaForge that his recent actions "placed the town at great risk and liability and that he would have no access to any HFD facilities upon leaving, or any contact with any on-duty HFD personnel." (Howard Aff. at p. 207, line 11-16). LaForge was instructed to collect his gear and return it to Captain Landry. LaForge complied and left the premises.

A letter dated August 12 was sent to LaForge restating Chief Howard's comments. The letter was signed by Chief Howard and Farrell. The letter, which reads as if written by Chief Howard, states, "This directive was carried out by self to you upon

10

notice from the Town Administrator." The letter also states that LaForge would not be paid his compensation benefits because he had failed to submit a revised resignation as instructed.[5] The CFD revoked LaForge's employment offer on September 24, 1999.

Chief Howard filed a formal complaint with the EMS Bureau on September 7, 1999, alleging that LaForge, Lombardo, and Tri-Town had violated state law in connection with their conduct surrounding the run form incident. In response to Chief Howard's complaint the EMS Bureau conducted a full investigation. On December 7, 1999, the EMS Bureau issued its findings that as to each of Chief Howard's complaints, "no violation of the statute is apparent."

LaForge brought this action pursuant to 42 U.S.C. § 1983 on September 13, 2000. In Count I, he alleges that Chief Howard and Hooksett terminated him and took adverse employment action against him in retaliation for his exercise of First Amendment free speech rights regarding the ambulance issue. He also alleges, in Count II, that Chief Howard and Hooksett deprived him of a liberty interest in violation of his procedural and substantive due process rights under the Fourteenth Amendment.

Further, LaForge brings four state law claims against Chief

---

[5] LaForge filed a union grievance claiming his vacation pay. This was denied.

Howard and Hooksett. In Count III, he alleges that Chief Howard defamed him by publishing false and defamatory information about him to the CFD. In Count IV, LaForge brings a claim of intentional interference with contractual relations, alleging that Chief Howard interfered with his contractual relations with the CFD, which resulted in the CFD's reconsidering and eventually revoking LaForge's employment offer. In Count V, LaForge brings a claim of malicious prosecution, alleging that Chief Howard filed a complaint about him with the state EMS Bureau without probable cause. And in Count VI, he brings a claim of wrongful termination, alleging that the town terminated him in retaliation for expressing his opinion on an issue of public policy.

## Discussion

The defendants move for summary judgment on all counts. They argue that no genuine issues of material fact exist and they are entitled to judgment on the merits in their favor as a matter of law. In the alternative, they argue that Chief Howard is entitled to immunity from the claims against him as an individual, and that Hooksett did not violate LaForge's rights, as alleged in the § 1983 claims, and is entitled to discretionary function immunity as to the state claims.

As a preliminary matter, the defendants seek dismissal of

12

any claims brought against Chief Howard in his official capacity as chief of the HFD, asserting that those claims are actually claims against the town, and since Hooksett is a named defendant, those claims are duplicative. "[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. Dep't of Social Servs. of N.Y., 436 U.S. 658, 690 n.55 (1978). "Suits brought against parties in their official capacity are treated as suits against the municipality." Bryant v. Noether, 163 F. Supp. 2d 98, 104 n.2 (D.N.H. 2001), citing Brandon v. Holt, 469 U.S. 464, 471-72 (1985). Here, Chief Howard is an official of Hooksett, and the town is a named defendant. Claims against Chief Howard in his official capacity would be duplicative of the claims against Hooksett. To the extent that LaForge brings claims against Chief Howard in his official capacity, those claims are dismissed.

I.   LaForge's § 1983 Claims

LaForge asserts claims for damages pursuant to 42 U.S.C. § 1983.[6]  In Count I of his amended complaint, LaForge alleges that

---

[6] Section 1983 provides:  "Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities

13

the defendants violated his rights under the First Amendment. In Count II LaForge alleges that the defendants violated his rights to procedural and substantive due process under the Fourteenth Amendment. The defendants move for summary judgment on all counts. LaForge objects.

## A. First Amendment Claim

The defendants move for summary judgment on the merits of LaForge's First Amendment claim, on the ground that relieving him of duty, with pay, and denying his request to rescind his resignation did not constitute adverse employment action. Alternatively, Chief Howard contends that LaForge's protected expression was not a substantial or motivating factor for any adverse action taken. Because the record does not support LaForge's First Amendment retaliation claim, the defendants argue, no basis exists for liability on the part of Hooksett.

LaForge, a public employee, must meet a three-pronged test to establish a claim for infringement of his First Amendment right. See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). LaForge must show (1) that his speech on the matter of the HFD ambulance service was a matter of public concern; (2) that his

secured by the Constitution and laws, shall be liable to the party injured in an action at law."

14

interest and the public's interest in free discourse on that matter outweighed the countervailing governmental interest in promoting efficient public service; and (3) that his protected expression was a motivating or substantial factor in an adverse employment action. See Mt. Healthy City Sch. Bd. of Educ. v. Doyle, 429 U.S. 284, 287 (1977); Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 78 (1st Cir. 2000); Tang v. R.I. Dep't of Elderly Affairs, 163 F.3d 7, 12 (1st Cir. 1998). The defendants contend that LaForge has not met the third prong of the test, because he was not terminated, and he suffered no other adverse action.[7]

An adverse employment action need not rise to the level of termination to be actionable. See Rutan v. Republican Party of Ill., 497 U.S. 62, 75 (1990). Promotions, transfers, failure to recall after layoffs, and other "deprivations less harsh than dismissal" may constitute adverse employment actions. Id. However, "not everything that makes an employee unhappy is an

---

[7] In their motion for summary judgment the defendants concede that LaForge was engaged in protected expression, and they do not challenge the balancing of interests element. In their reply to LaForge's objection to summary judgment, however, the defendants recede from their concession and argue that LaForge's expression was not protected. LaForge moved to strike the defendants' reply. In a separate order that will issue on this date, the court has granted LaForge's motion in part and strikes the defendants' protected expression argument as raised in its reply.

actionable adverse action." <u>Bechtel v. City of Belton</u>, 250 F.3d 1157, 1162 (8th Cir. 2001) (quotation omitted); <u>see also</u> <u>Blackie v. State of Maine</u>, 75 F.3d 716, 725 (1st Cir. 1996); <u>Welsh v. Derwinski</u>, 14 F.3d 85, 86 (1st Cir. 1994). In a retaliation case, the plaintiff must show that the employer took a materially adverse employment action against him. <u>Blackie</u>, 75 F.3d at 725; <u>Larou v. Ridlon</u>, 98 F.3d 659, 663 n.7 (1st Cir. 1996) (applying <u>Blackie</u> to § 1983 claim).

"Determining whether an action is materially adverse necessarily requires a case-by-case inquiry." <u>Welsh</u>, 14 F.3d at 86. "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." <u>Blackie</u>, 75 F.3d at 725-26 (internal citations omitted); <u>see also</u> <u>Simas v. First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 50-51 (1st Cir. 1999); <u>Meaney v. Dever</u>, 170 F. Supp. 2d 46, 56 (D. Mass 2001); <u>Siaca v. Autoridad de Acuductos y Alcantarillados de P.R.</u>, 160 F. Supp. 2d 188, 202 (D.P.R. 2001) (finding adverse employment action for § 1983 First Amendment claim where plaintiff was transferred and

16

denied promotions).  "Most cases involving a retaliation claim are based on an employment action which has an adverse impact on the employee, i.e., discharge, demotion, or failure to promote."[8] Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir. 1991), cert den'd, 501 U.S. 1218 (1991) (finding that employee discharged two weeks prior to notified date of discharge but paid for full four weeks did not state an adverse employment action for ADEA claim).

LaForge was relieved of duty, with pay, for the two days remaining of his employment before his resignation became effective on August 14.  LaForge was not deprived of pay, benefits, or any other accouterment of employment discernable from the record.[9]  Although LaForge was divested of his normal job responsibilities for his last two shifts, he fails to show how he was materially adversely affected by not working those shifts.  Since his employment ended on August 14, he was not in a

_____

[8]Although Connell involved an ADEA claim and not a § 1983 claim, the First Circuit has held that "the fundamental meaning of adverse employment action should remain constant regardless of the particular enabling statute, given their similar anti-discriminatory purpose."  Larou, 98 F.3d at 662 n.6 (applying ADEA adverse employment action analysis in Connell to a § 1983 claim).

[9] LaForge's ineligibility to receive his accrued vacation and sick pay was a result of his own failure to resubmit his resignation effective August 17, instead of August 14.

17

position to be adversely effected by future promotions, transfers, seniority privileges, or other work-related actions. See Connell, 924 F.2d at 1179-80. LaForge has not shown a genuine dispute of material fact as to whether relieving him of duty with pay constituted an adverse employment action for the purpose of his § 1983 claim.

LaForge also alleges that Hooksett's denial of his request to rescind his resignation constitutes an adverse employment action. "[U]nder certain circumstances an employer's inaction can operate to deprive an employee of a privilege of employment that an employee had reason to anticipate he would receive; in those situations, the deprivation constitutes an adverse employment action." Blackie, 75 F.3d at 726. A plaintiff must have a reasonable expectation that an employer will take a particular action before the employer's failure to do so may be construed as an adverse employment action. Id.; see also Lynch v. City of Boston, 180 F.3d 1, 12 (1st Cir. 1999). A plaintiff's conjecture that action will occur is not sufficient to establish a reasonable expectation. See Larou, 14 F.3d at 663.

LaForge acknowledges that the decision to deny his request to rescind his resignation was entirely within Hooksett's discretion. Since LaForge's employment was ending pursuant to the resignation he had submitted, he did not have a reasonable

18

expectation that he would be rehired.  Cf. Lynch, 180 F.3d at 12; Larou, 14 F.3d at 663.  LaForge has not shown a factual dispute that the decision to deny his request to rescind his resignation deprived him of a privilege of employment he had a reasonable expectation of receiving.  See Blackie, 75 F.3d at 726. Therefore, because no trialworthy issue remains as to whether Hooksett's decision not to rescind his resignation was a materially adverse employment action for the purpose of his § 1983 claim, the defendants are entitled to summary judgment on that claim.

B.    Fourteenth Amendment Due Process Claims

In Count II, LaForge brings claims under the procedural and substantive due process clauses of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1.  LaForge asserts that the defendants violated his liberty interest by disseminating defamatory information, which resulted in a stigma on LaForge that has foreclosed his freedom to take advantage of other employment opportunities.  The defendants move for summary judgment on the ground that LaForge was not deprived of a constitutionally protected interest, and therefore was not entitled to procedural

19

or substantive due process.[10]

"To formulate a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty or property, and that state action has deprived him or her of that interest." Metivier v. Town of Grafton, 148 F. Supp. 2d 98, 106 (D. Mass. 2001). "Fourteenth Amendment 'liberties' include 'the right of the individual . . . to engage in any of the common occupations of life.'" Temple v. Inhabitants of the City of Belfast, 30 F. Supp. 2d 60, 66 (D. Me. 1998), quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972). Due process is invoked when a government employer makes severely defamatory charges that might seriously damage one's standing in the community or impose a stigma that significantly interferes with the ability to find employment. Roth, 408 U.S. at 573.

Damage to one's reputation, alone, does not work a deprivation of liberty protected by the Fourteenth Amendment. See Paul v. Davis, 424 U.S. 693, 701 (1976). For an injury to reputation caused by a government official to rise to the level of a constitutional liberty interest deprivation, it must be

---

[10] The defendants also argue that LaForge does not have a protected property interest in his job with the HFD. LaForge does not claim a property interest.

20

coupled with a tangible change in the injured person's legal status or rights. See Siegert v. Gilley, 500 U.S. 226, 233 (1991); Paul, 424 U.S. at 709-11; Silva v. Worden, 130 F.3d 26, 32 (1st Cir. 1997). The First Circuit applies this doctrine (the "stigma-plus" test) to determine if a deprivation of a liberty interest has occurred. See Hawkins v. R.I. Lottery Comm'n, 238 F.3d 112, 115 (1st Cir. 2001).

Termination from a tenured or statutorily guaranteed position frequently constitutes a tangible alteration in legal status. Beitzell v. Jeffrey, 643 F.2d 870, 877 (1st Cir. 1981); Rodriguez de Quinonez v. Perez, 596 F.2d 486, 489-90 (1st Cir. 1979) (recognizing liberty interest where plaintiff was removed from statutory bank director position on ground of dishonesty); cf. Lyons v. Sullivan, 602 F.2d 7, 11 (1st Cir. 1979) (holding that allegedly defamed plaintiff could not maintain § 1983 action because he was not terminated from his tenured position, but had resigned). In contrast, a person is not deprived of his liberty interest if he "simply is not rehired in one job but remains as free as before to seek another." Roth, 408 U.S. at 575.

Here, LaForge was an at-will employee with no right to his position, and his employment with the HFD ended by the terms of his own resignation, not termination. Although the HFD did not grant his request to rescind his resignation, a decision not to

21

rehire does not constitute a tangible alteration in legal status. See Roth, 408 U.S. at 575. To the extent LaForge contends his liberty interest was affected by the CFD's decision to postpone and ultimately withdraw its employment offer, he must show that action was a tangible alteration in legal status.

In some circumstances, a tangible alteration in legal status can occur where a government employer's "false and defamatory charges" are so serious they impose a stigma on the plaintiff such that he is foreclosed from subsequent employment. See Beitzell, 643 F.2d at 879; Ortega-Rosario v. Avarado-Ortiz, 917 F.2d 71, 74 (1st Cir. 1990); Cronin v. Town of Amesbury, 895 F. Supp. 375, 383 (D. Mass. 1995). The stigma imposed by the government employer's defamatory remarks must be serious, a "badge of infamy" that would damage the employee's standing and associations in his community. See Roth, 408 U.S. at 573 n.12 (collecting cases of liberty interest deprivation that involved stigmatizing charges of "subversive activities"); Valmonte v. Bane, 18 F.3d 992 (2d Cir. 1994) (holding that listing plaintiff teacher on New York State register of child abuse was sufficient stigma). Discussions about a plaintiff's credentials and adequacy of job performance, however, "threaten no special injury." Beitzell, 643 F.2d at 878 (stating that university advisory board's recommendation against retaining plaintiff did

22

not injure plaintiff's reputation sufficiently to establish deprivation of liberty interest); see also Siegert, 500 U.S. at 234 (finding no deprivation of liberty interest where plaintiff had resigned and former employer provided unfavorable information to prospective employer in recommendation letter).

An employee's ability to secure subsequent employment is a touchstone for the level of stigmatization incurred. See Ortega-Rosario, 917 F.2d at 74-75 (noting that because plaintiff was able to obtain two other jobs, allegedly defamatory statements contained in his personnel file did not impair his freedom to seek employment); Temple, 30 F. Supp. 2d at 66. Another indicator of stigma is whether the defamatory information was disseminated to the public in a formal setting, such as at a public meeting or to the press. See Silva, 130 F.3d at 32-33; Beitzell, 643 F.2d at 879 (noting that charges made publicly are more likely to interfere with employment opportunities).

LaForge argues that he was stigmatized by Chief Howard's remarks that LaForge had improperly breached patient confidentiality and broken the chain of command. LaForge claims that as a result of Chief Howard's allegedly defamatory statements and his complaint to the EMS Bureau, he was stigmatized so that his ability to secure future employment was impaired. The record demonstrates, however, that LaForge

23

prevailed over Chief Howard's complaint to the EMS Bureau and retained his paramedic certification. He began employment with Tri-Town as a paramedic the day he left the HFD; he secured a full-time paramedic position with the Goffstown Fire Department a few months later; and he continues to hold that position. LaForge has successfully obtained employment in his field since his departure from the HFD despite Chief Howard's complaint to the EMS Bureau and his remarks to the CFD.

It is apparent from the record that the information disseminated by Chief Howard to the CFD was a factor in the CFD's decision to withdraw its offer, but remarks made in the context of discussing a candidate for a job do not constitute the "badge of infamy" required to invoke a liberty interest. See Beitzell, 643 F.2d at 878. Furthermore, there is nothing in the record indicating that any allegedly defamatory information about LaForge was disseminated to the public in a formal setting. In sum, the record does not show that LaForge was foreclosed from further employment as a firefighter/paramedic due to Chief Howard's statements or actions. The comments made by Chief Howard to the CFD when discussing LaForge's impending employment do not rise to the stigmatizing level necessary to establish the deprivation of a liberty interest.

LaForge has not shown a dispute of fact as to whether his

24

legal status or rights were altered due to Chief Howard's allegedly defamatory remarks. Therefore, he has not met the "stigma-plus" test required to show the deprivation of a liberty interest. LaForge does not assert that he was deprived of any other type of constitutionally protected interest. Summary judgment is granted in favor of the defendants on LaForge's Fourteenth Amendment procedural and substantive due process claims.

C. Municipal Liability

Hooksett moves for summary judgment on the ground that it is not liable for the acts of Chief Howard and Town Administrator Farrell, because LaForge has not shown that their actions constitute a municipal policy, practice, or custom sufficient to establish liability under § 1983. "Municipalities are liable for constitutional violations resulting from their official policies and customs." Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 5 (1st Cir. 2000), citing Monell, 436 U.S. at 690. "Normally, therefore, a municipality cannot be held liable unless its agent actually violated the victim's constitutional rights." Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998).

For the reasons discussed above, LaForge has not shown that Chief Howard's actions deprived him of either his First or

25

Fourteenth Amendment rights. Hooksett might still be liable if Farrell's actions constituted a municipal policy or custom that deprived LaForge of his federal rights. According to the record, Farrell's involvement in the events that led to LaForge's claims is limited to his decision not to rescind LaForge's resignation. The decision not to rescind LaForge's resignation did not constitute an adverse employment action for the purpose of LaForge's First Amendment claim. Since the record shows no action by Farrell that would constitute deprivation of LaForge's liberty interest, no Fourteenth Amendment violation occurred. Because no trialworthy issue remains as to Hooksett's liability, summary judgment is granted in favor of Hooksett as to LaForge's § 1983 claims.

II. <u>State Claims</u>

In the absence of LaForge's federal claims, the court declines to exercise supplemental jurisdiction over his remaining state claims. The state claims are dismissed, without prejudice, for lack of subject matter jurisdiction.

## Conclusion

The defendants' motion for summary judgment (document no. 12) is granted as to the plaintiff's federal claims in Counts I and II.  The plaintiff's state claims are dismissed without prejudice.  The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 30, 2002

cc:  V. Richards Ward Jr., Esquire
     Lawrence S. Smith, Esquire

27