Benjamin Edelman was a Harvard Business School professor. He thinks the School (or “HBS”) made a big mistake in not recommending that he be granted lifetime tenure. Edelman blames the Faculty Review Board (“FRB”), claiming that it did not follow required procedures in reviewing his conduct.
When Edelman was considered for tenure in 2015, two recent incidents raised questions about whether he consistently upheld HBS community values, which is one of the School’s three tenure criteria. The first was a blog post in which Edelman accused a company of wrongdoing and caused its stock price to plummet, based on research paid for by firms that were short-selling the company’s stock. That was followed by Edelman’s highly-publicized attack on a Chinese-food restaurant about an alleged $4 overcharge.
The FRB examined whether Edelman had displayed good judgment, integrity, and respect for others within and outside the School. After the FRB issued its report, a faculty committee recommended extending Edelman’s appointment by two years to give him more time to show that he should be granted tenure. The Dean offered and Edelman accepted the extension.
When the School reopened Edelman’s tenure case in 2017, the FRB conducted a further investigation. In its second report, the FRB found that Edelman had not shown he had learned from the prior incidents. It addressed Edelman’s decision to bring a class-action lawsuit against American Airlines without first alerting the Dean. It also expressed concerns that Edelman had not properly disclosed his work for Microsoft when he released papers criticizing Google, a competitor, again without seeking input from others.
A standing committee of faculty members reviewing tenure candidates was sharply divided as to Edelman; half voted in favor of giving him tenure and half voted against. When all tenured faculty voted, 57 percent were in favor of
 
                                                            -1-
 
giving Edelman tenure and 40 percent were opposed. It was then up to the Dean to decide whether to recommend that Edelman be granted tenure.
The Dean concluded that Edelman met the tenure criteria for intellectual and teaching contributions, but had not shown that he satisfied the criterion for contributions to the HBS community. The Dean recommended against promoting Edelman to a tenured position. As a result Edelman did not receive tenure and left HBS.
Edelman filed this lawsuit more than five years after the Dean exercised his broad discretion not to recommend him for tenure. He is suing the President and Fellows of Harvard College, which is the legal name and governing board of Harvard University; within the University this board is called “the Corporation.” Edelman’s amended complaint asserts three claims for breach of contract. Count I alleges that an HBS policy describing FRB procedures is contractually binding, the FRB did not follow that policy in 2017, and Harvard is therefore liable for breach of contract. Count II alleges that the manner in which the FRB conducted its further review in 2017 violated the implied covenant of good faith and fair dealing. Count III, which is labelled as a claim for “promissory estoppel,” alleges that Harvard promised that any FRB review process would follow the FRB Procedures document, Edelman relied on that promise, and Harvard breached the terms of that promise.
Harvard has moved for summary judgment in its favor on all three claims. Edelman has filed a cross-motion for partial summary judgment as to Harvard’s liability under Count I.
The Court will allow Harvard’s summary judgment motion and deny Edelman’s cross-motion. Harvard is entitled to judgment in its favor as a matter of law for three reasons. First, the record establishes that Edelman cannot prove that the FRB Procedures were contractually binding. Second, Edelman has mustered no evidence that the FRB violated this policy or the implied covenant of good faith and fair dealing. Third, Edelman cannot prove that the FRB’s alleged violation of its procedures caused him to suffer any harm; Edelman presents no evidence that the purported procedural snafus had any effect on the Dean’s decision not to recommend Edelman for tenure.
* * *
1. Factual Background. Edelman attended Harvard University as an undergraduate and as a graduate student, receiving an  A.B. in Economics, an A.M. in Statistics plus a Ph.D. in Economics from the Harvard Graduate School
 
                                                            -2-
 
of Arts and Sciences, and a J.D. from Harvard Law School. He joined the HBS faculty as an Assistant Professor in April 2007. Edelman was promoted to a four-year appointment as Associate Professor in 2012, with the expectation he would be considered for promotion to a tenured position within that period.[1]
The following facts concerning Edelman’s quest for tenure, and the HBS Dean’s decision not to recommend that Edelman receive tenure, are undisputed for purposes of the cross-motions for summary judgment. They are established by the voluminous summary judgment record, which includes 186 exhibits.[2]
1.1. The HBS Tenure Process. Tenure decisions at Harvard University are made by the Corporation, based on recommendations by the University’s President. When an HBS professor is being considered for tenure, the School’s Dean has the sole responsibility to decide whether to recommend to the President that the professor should be granted tenure.
The tenure review process at HBS is described in the School’s “Policies and Procedures with Respect to Faculty Appointments and Promotions,” known as the Green Book. This document was approved by faculty vote in September 2007 and revised by another such vote in May 2013.
The Green Book states that tenure at HBS is granted only to “extraordinary individuals who have demonstrated their ability and willingness to make a sustained contribution to the study, teaching, and practice of business.”
A grant of tenure at HBS involves promotion to the position of Professor of Business Administration, which is the School’s only faculty appointment that carries tenure. Such a promotion grants the privilege of lifetime employment at HBS subject to fairly limited oversight thereafter.
 
--------------------------------------------
 
[1] The facts recounted in this paragraph are taken from Edelman’s amended complaint. Edelman is bound by the allegations in his pleading. See G.L. c. 231, § 87; Adiletto v. Brockton Cut Sole Corp., 322 Mass. 110, 112 (1947).
[2] A caution for anyone trying to find particular items in the record: Harvard’s memoranda and statement of facts include some incorrect page citations. The parties numbered each page in the joint appendix using the format JA-xxxx. Many of these documents also have Bates numbers in the form HBS00yyyyy, presumably because they were produced by HBS during discovery. Some citations in Harvard’s memoranda and statement of facts confusingly combine the “JA” prefix with digits taken from a Bates number; though these cites are in the form JA-yyy, where the “JA” suggests that this is a joint appendix page number, the “yyy” numbers are actually the final digits from the Bates number.
 
                                                            -3-
 
A tenure candidate at HBS is evaluated using three criteria: (i) their intellectual contributions as a scholar and educator; (ii) their teaching contributions in developing course materials, delivering classes to students, sharing teaching insights with colleagues, and supporting student’s learning outside the classroom; and (iii) their contributions to the HBS community in upholding its values—including by displaying “honesty, integrity, and respect for others”— and in accepting a fair share of School responsibilities, contributing to the School’s teaching and research environment, and advancing the School’s mission. This third criterion is often referred to as HBS’s “Community Standards” or “Community Values.” The Green Book emphasizes that any tenure candidacy “must be supported by persuasive evidence” that the faculty member has the HBS’s Community Standards and will continue to do so.
In describing the faculty appointment and promotion process at HBS, the Green Book notes that “the primary objective … is to provide the Dean with the best possible information, judgment, and advice on various faculty appointments.”
Consistent with that goal, the Green Book also provides that, “[b]ecause the Dean has the sole responsibility for the recommendations made to the President, the Dean may initiate or approve variances” from HBS procedures for faculty appointments and promotions whenever the Dean believes that “the circumstances of a particular case warrant it” or that doing so would be “in the best interests of the School.”
The process for reviewing a tenure candidate at HBS is generally as follows. The Appointments Committee consists of all tenured HBS Professors. To begin the tenure review process, an ad hoc Subcommittee—usually consisting of three tenured faculty members from outside the candidate’s unit—is formed to conduct an initial evaluation of each candidate based on the three criteria summarized above. This Subcommittee reviews the materials submitted by the candidate, solicits input from the candidate’s unit, and recruits outside reviewers to evaluate the candidate’s work product.
In cases where previous or current conduct raises a question of whether the candidate meets the School’s Community Standards, the Dean may also choose to ask a Faculty Review Board to undertake a review of those issues. The role of an FRB is described in a document titled “Principles and Procedures for Responding to Matters of Faculty Conduct” (the “FRB Procedures”). That document gives the Dean discretion to ask an FRB to conduct a review in two
 
                                                            -4-
very different kinds of cases. The Dean may ask an FRB either (i) to determine whether a faculty member engaged in misconduct that may lead to sanctions or (ii) to evaluate whether a faculty member being considered for promotion, review, or reappointment has engaged in conduct that raises a question of whether they meet the Green Book criteria for effective contributions to the HBS community. As discussed below, in § 2.1.2.2 of this decision, all reasonable faculty members would have understood that only the second aspect of the FRB Procedures is relevant here. The FRB Procedures document was prepared by a small committee. The Dean presented it at a faculty meeting in April 2015 and then adopted this policy without a faculty vote.
Once the Subcommittee and any FRB finish their work, each tenure candidate is reviewed by a Standing Committee composed of all the members of that year’s tenure appointment subcommittees. This additional step was adopted by the Dean, acting through the Senior Associate Dean for Faculty Development, in May 2015 without a faculty vote.
After the Standing Committee has voted, the full Appointments Committee (consisting of all tenured faculty) considers each candidate. Its members receive, review, and discuss the report and recommendations of the Subcommittee on each candidate and the report of the FRB, if any. The Appointments Committee then votes on each tenure candidate.
Based primarily on the input of these different committees of tenured faculty members, the Dean then decides whether to recommend that a candidate receive tenure. The Dean is not bound by the Appointments Committee’s vote. Instead, the Dean has full and unfettered discretion to decide whether to recommend to the President that an HBS faculty member receive tenure.
1.2. The 2014 Incidents. During 2014, the year before he was to be reviewed for tenure, Edelman’s conduct in two different matters led to significant adverse publicity not only for Edelman but also for HBS.
In January 2014, Edelman posted a public blog post that, in Edelman’s words, created “a firestorm.” Edelman accused a UK company called BlinkX of engaging in deceptive advertising practices. The blog post was based on research that two investment firms had paid him to conduct. The company’s stock price fell dramatically soon after Edelman posted his accusations. HBS received media questions about Edelman’s potential conflict of interest as a paid researcher for short-selling investment firms that stood to profit from the sharp stock price decline that was caused by Edelman’s blog post.
 
                                                            -5-
 
Then things got worse.
In December 2014, the website Boston.com posted an article with the headline, “Ben Edelman, Harvard Business School Professor, Goes to War Over $4 Worth of Chinese Food.” It also posted the lengthy email exchange that Edelman initiated with a restaurant called Sichuan Garden. In these emails, Edelman expressed outrage that the amount the restaurant charged for a takeout order was $4 higher than the prices posted on its website. Edelman sent five emails over three days in which said the restaurant had violated the Massachusetts Consumer Protection Act, demanded that it pay him three-times the amount of the alleged overcharge, said he had “referred this matter to applicable authorities,” and later asked the restaurant to make his order half-price.
The publication of Edelman’s sustained attack against a small local restaurant elicited an outcry of criticism and extremely negative press coverage. Public commentary included negative statements about HBS. One prominent legal commenter tweeted, “Here is why people hate (a) @Harvard and (b) lawyers.”
HBS Dean Nitin Nohria received what he described as a “tsunami” of emails about Edelman’s conduct. One HBS graduate wrote the following:
If it isn’t obvious, this type of behavior is truly embarrassing for me, as an alumnus and as someone who is proud of Harvard Business School.… It likely goes without saying, but as a faculty member, Ben Edelman represents both the school and[,] to an extent, the alumni who attended the school. Not only do I lack confidence that he will represent us collectively well in the future, his lack of judgment, both in the heat of the moment as well as in follow on communication[,] indicates that he is likely unsuitable for a leadership position. This behavior is bullying, masked in a thin guise of pseudo-legal rhetoric. I shudder to think at his behavior under the secure protection of tenure.
Edelman testified during his deposition that these incidents were “two high water marks” of “negative publicity” for HBS.
1.3. The 2015 Tenure Review. Edelman was first considered as a candidate for tenure in 2015. At the beginning of the tenure review process, in March 2015, Edelman submitted a 15-page personal statement.
In Dean Nohria’s view, the BlinkX and Sichuan Garden incidents raised serious questions about whether Edelman met HBS’s Community Standards. Edelman concedes the point, acknowledging under oath that these two controversies gave HBS leaders a “basis to be concerned” about whether he was “capable of
 
                                                            -6-
 
exercising good judgment,” and “were right to be thinking about whether it could happen again.”
Because of these concerns, Dean Nohria decided to involve the Faculty Review Board. In mid-July 2015, the Senior Associate Dean for Faculty Development (Paul Healy) wrote Edelman to inform him that, due to concerns about whether Edelman was able to meet the “Effective Contributions to the HBS Community” standard required of successful tenure candidates, he was referring this aspect of Edelman’s case to the FRB.
The FRB chair, Prof. Amy Edmondson, followed-up in writing two weeks later. She informed Edelman that the FRB would be considering the BlinkX and Sichuan Garden incidents because they “raised questions about [his] conduct, including the impact of [his] actions on HBS, the members of its community, and others.” Edmondson also told Edelman that the FRB would be evaluating his “interactions with staff and other colleagues at the School.”
Edelman was satisfied with this description of the scope of the FRB’s review and believed that it complied with the FRB Procedures. He provided the FRB with a seven-page written statement in mid-August.
The FRB sent its draft report to Edelman in October 2015. It gave Edelman an opportunity to respond in writing. He did so in early November.
The report did not identify the people that the FRB interviewed, provide copies of interview notes, or compile any other evidence that was considered by the FRB but not disclosed in the draft report. Edelman never complained that the draft report did not include all of the evidence gathered by the FRB.
The FRB’s report included findings about Edelman’s BlinkX blog post, his email exchanges with the owner of Sichuan Garden, and his interactions with HBS staff. The FRB found that in all three of these areas Edelman “did not uphold the School’s Community Values, and his conduct in each instance did not meet the criteria for ‘Effective Contributions to the HBS Community.’ ”
With respect to the BlinkX post, the FRB found that Edelman “did not appear to understand that conflicts of interest, real or perceived, could arise not only when he had been paid directly by a company for his work, but [also] as a result of past work for clients in the same industry or field,” and that Edelman “failed to recognize that as a faculty, integrity in our activities—both real and perceived—is at the core of what we do.”
 
                                                            -7-
 
With respect to the Sichuan Garden incident and interactions with staff, the FRB found that Edelman “did not demonstrate respect for others” and that “[h]is tone was overly harsh, his approach was dogged, and he demonstrated a lack of appreciation for a difference of views.”
The FRB concluded that Edelman was too prone to believe that he was always right, anyone with a different opinion was wrong, and thus it would be a waste of his time to elicit or consider other people’s views. The FRB explained that:
Professor Edelman has consistently exhibited a tendency toward absolutism and extreme certainty that his view is the right view. His apparent certainty that his is the single right perspective, without regard for others’ perspectives, was evident in his written and oral response to the committee and was mentioned (although not always as a weakness) by senior colleagues. We do not see persuasive evidence of accountability for personal behavior that would reflect evidence of learning. Although Professor Edelman might argue that his work is in fact “making a difference in the world” and is consistent with the School’s mission, we would suggest that how he goes about his work matters and is essential to our Community Values.
The FRB also shared the following observations.
We found a consistent pattern in Professor Edelman’s responses: apology followed by reiteration of the merits of his side of the story. For those on the receiving end, this kind of apology often falls short— and feels insincere, even if intended sincerely. His tenaciousness in reemphasizing the rightness of his side of a story makes it hard for us to be confident that he has learned, that he has changed in a deeper way, or that he is accountable for his personal behavior. …
When we considered Professor Edelman’s certainty, together with his tenaciousness, we were left with a concern about whether he is able, without close guidance, to know when to let go of an issue and recognize an alternative perspective, for the broader good of the institution and/or the community members within and outside the institution. These characteristics, as reflected in the Blinkx and Sichuan Garden matters as well as in his interactions with others at HBS, made us question whether Professor Edelman can make effective contributions to the HBS community in accordance with our Community Values.
After the FRB completed its work, the Standing Committee reviewed the FRB’s report and considered Edelman’s tenure case. It recommended that the Dean offer Edelman a two-year extension of his faculty appointment, through June
 
                                                            -8-
2018. That would have the effect of deferring Edelman’s tenure case for two years to give him time to show that he had learned from the concerns raised by the FRB and, with the benefit of another two years of experience as an HBS professor, demonstrate that he met the School’s Community Standards. Dean Nohria agreed, with the understanding that in 2017 he would ask the FRB to take another look when Edelman’s tenure case was reopened.
Dean Healey conveyed the offer of a two-year extension. He told Edelman that the Standing Committee had been focused on the BlinkX and Sichuan Garden incidents. Healey conveyed that Dean Nohria had made clear there were “no guarantees” that Edelman would receive tenure when his promotion case was reopened in two years, explaining that the extension was intended to give Edelman time to demonstrate that he had gotten the message and “learned the lessons” from the FRB’s report. Healey told Edelman that the School would need to evaluate his progress on the concerns raised by the FRB.
Edelman accepted the proposed extension. Edelman understood that, when his tenure case was reopened, he would bear the burden of establishing that he should be granted tenure, including that similar incidents would not happen again and that he met the Community Standards criteria.
1.4. The 2017 Tenure Review. In January 2017, Senior Associate Dean Healy emailed Edelman about the reopening of his tenure case. Edelman already understood that the FRB was again going to be interviewing people in connection with his tenure review, and offered to identify people they could speak with. He expected that the FRB’s 2017 review would be similar to its 2015 review “in terms of the methods used, the kinds of information provided at the outset, and the kinds of information provided” in the FRB’s report.
1.4.1. Edelman’s Participation in the FRB’s Investigation. In mid-March 2017, Edelman submitted to the FRB an eight-page document titled “Reflections on Feedback from Faculty Review Board.” Edelman acknowledged in this document that he had known since his tenure track was extended that, once his tenure case was reopened, “a further review” by the FRB “would soon follow”.
Edelman used this submission to address issues he knew would be of concern to the FRB. Among other things, Edelman: (i) provided information about some of his activities outside of HBS from 2015 to 2017; (ii) reported that, “[i]n response to the Blinkx matter,” he had worked to avoid “relationships that might create an appearance of conflict of interest” and was sensitive to the need to provide “improved disclosures that leave no doubt [about] what I’m doing
 
                                                            -9-
 
or why;” and (iii) identified at least 28 faculty outside of his HBS unit and 13 current or former HBS staff members that, according to Edelman, had been able to make “extended observations yielding possible insight into my character.”
After the FRB discussed Edelman’s submission, the FRB chair wrote to Edelman in early July on behalf of the FRB. She reminded Edelman that:
As articulated in our October 2015 report, the FRB found that your conduct in the Blinkx and Sichuan Garden incidents, as well as in interactions with staff, did not uphold the School’s Community Values and did not meet the School’s green book criteria for “Effective Contributions to the HBS Community.” We recommended that these concerns be taken into account during the promotions process. In November 2015, the Standing Committee then recommended deferring your case for two years to enable you to demonstrate whether you had indeed internalized lessons learned, anticipating that the FRB would again be activated during summer/fall 2017 to review your conduct.
Prof. Edmondson then discussed the scope of the upcoming review. She told Edelman that, “The FRB now must assess:
*          whether you understand the aspects of your conduct—regardless of your intent—that made them problematic;
*          whether there is sufficient evidence of changed behavior; and
*          whether there is a reasonable expectation that your changed behavior will be sustained in the future.”
Edelman responded by submitting an additional written statement to the FRB on July 31, 2017, together with a “prioritized” list of the faculty and staff members that he most wanted the FRB to interview. One topic that Edelman addressed in this further statement was his decision to file a consumer class action lawsuit a few weeks earlier against American Airlines concerning fees for checked luggage. The named plaintiff in that lawsuit was another HBS professor. Edelman did not tell the Dean, and did not consider speaking with the Dean, before filing this suit. Other topics that Edelman discussed in this document included a response to the FRB’s “previously reported concerns about the style of my interactions with certain HBS staff,” and a discussion of Edelman’s attention to his obligation to disclose—in academic papers and otherwise—“relationships that might be seen as creating a conflict of interest.”
The FRB interviewed Edelman on August 14. Edelman and the FRB members discussed the American Airlines lawsuit and Edelman’s working relationship with HBS staff members, among other topics.
 
                                                            -10-
 
In late August, Dean Healy brought to the FRB’s attention a recent Wall Street Journal article titled, “Paying Professors: Inside Google’s Academic Influence Campaign.” The article focused on Google’s payment for academic research, but noted that other companies “are also active” in providing similar funding. As an example, the article reported that, “Microsoft has paid Harvard business professor Ben Edelman, the author of papers saying Google abuses its market dominance.” This was true; Microsoft paid Edelman nearly $2 million between 2006 and 2015, and Edelman had then published papers accusing Google of abusing its market power. Healy asked the FRB whether Edelman’s “papers appropriately acknowledged his relationship with Microsoft.”
The FRB chair emailed Edelman again on September 1. Prof. Edmondson said she was writing with Dean Nohria’s approval to ask that Edelman provide lists of his outside activities and all work products in the public domain for the prior two years or so. She also invited Edelman to explain how he had thought about “when and where to seek advice or approvals on your outside activities, and when and how to include disclosures on your output.”
Prof. Edmonson did not impose any absolute deadline for Edelman to respond. She said that the FRB members were “hopeful you might be able to submit this summary by the end of next week (8 September),” but invited Edelman to let her “know if that time frame feels unreasonable.”
Edelman made no objection to this request and did not ask for more time to respond. Instead, on September 8 Edelman provided the FRB with a six-page response accompanied by a one-page list of his outside activities from October 2025 through September 2017 and a full listing of his recent work products.
1.4.2. Edelman’s Response to the FRB’s Draft Report. The FRB’s chair sent the FRB’s draft report to Edelman on Wednesday, September 27, 2017, and asked that he submit any written response within eight days. Edelman met that deadline, again without objection and without seeking any extension. He submitted an 11-page document titled “Reply to Faculty Review Board Questions” on October 5.
Edelman responded at some length to concerns raised in the FRB’s draft report about whether he adequately disclosed his work for Microsoft in writings and presentations about Google, whether he should have sought guidance from HBS before bringing a class action suit against American Airlines, and interactions with HBS staff.
 
                                                            -11-
 
Edelman defended his disclosures or lack of disclosures about his ties to Microsoft. Edelman wrote that his work for Microsoft “did not seem to me to be ‘directly related’ to my writings about Google” and that “once my Microsoft work ended, mindful of the fact it was not ‘directly related’ to Google in the first place, I concluded that further disclosures were no longer appropriate.” Edelman said that his conclusion “was informed by my assessment of what a reasonable reader would consider important,” and by his view that the School’s conflict of interest policy “offered no requirements to the contrary.” Edelman also wrote, “Had I interpreted the rules to call for disclosure about the historic work, or had anyone suggested that such disclosure was required or appropriate, I would have added it without hesitation.”
Edelman also explained why, in his view, he made the right call in not seeking “approval or guidance from the Dean or the School’s communication professionals” before filing a consumer class-action lawsuit against American Airlines. Edelman explained that he made that decision for a number of reasons, including that after having “carefully considered” the issue he “saw no significant reputational risk” to the School from his involvement.
With respect to his treatment of HBS colleagues, Edelman provided a five-page Appendix listing what he characterized as “distinctive interactions with staff, junior colleagues, and students.” Edelman said he was offering these examples to “demonstrate my commitment to lower-status members of our community” and to “demonstrate that lower-status members of our community in fact come to me, and feel comfortable coming to me, on the most sensitive subjects and for their most difficult problems.”
Edelman did not address whether his belief that HBS students, staff, and many non-tenured faculty members were “lower-status members of our community” was consistent with HBS Community Values, which require that faculty members seeking promotion must show they have “respect for others.”
1.4.3. The FRB’s Final Report. The FRB issued its final report one week later, after making revisions based on Edelman’s comments. The final report included an Addendum that discussed Edelman’s Reply as well as a list of changes that the FRB made to its draft report after reviewing Edelman’s Reply.
Like the prior report, the FRB’s 2017 report did not identify the people that the FRB interviewed, provide copies of the FRB’s interview notes, or compile any other evidence that was considered by the FRB and not disclosed in its report.
 
                                                            -12-
 
1.4.3.1. Description of FRB Investigation. The FRB described the results of its investigation in its 2017 report.
In its discussion of Edelman’s “respect for others inside the institution,” the FRB summarized feedback provided by 21 unidentified HBS faculty and staff members. The report made clear that many people provided “unambiguously enthusiastic” and other “positive” comments about Edelman. It also indicated that others “expressed concern about his style” and Edelman’s “lack of consideration for other points of view.”
In a separate section addressing “outside activities and conflict of interest,” the FRB “provide[d] two illustrative examples that point to potential concerns related to Professor Edelman’s work, outside activities, and disclosure.”
First, the FRB raised concerns as to whether Edelman appropriately disclosed his work for Microsoft in things that he published, presented, or posted about Google. The FRB identified four publications, one presentation, and one blog post by Edelman about Google during 2016 or early 2017. It reported that one paper said Edelman “has no current clients adverse to Google with respect to the practices discussed herein;” a second paper noted that “[n]o potential conflict of interest was reported by the authors;” a paper published in the Harvard Business Review disclosed that Edelman is “an adviser to various companies that compete against major platforms;” a blog post and a keynote address contained no apparent disclosure of any potential conflicts; and a paper published in December 2016 disclosed that Edelman “advises Microsoft on subjects unrelated to this article.” Edelman acknowledged under oath at his deposition that the FRB’s report accurately described the disclosures that Edelman made, or did not make, in these six publications or presentations.[3]
The FRB found that Edelman’s “reporting of disclosures is, at best, inconsistent.” It expressed concern that, “rather than providing information so that a reader might determine” whether Edelman has a “potential conflict,
 
--------------------------------------------
 
[3] Edelman now asserts, in responding to the Statement of Facts prepared by Harvard, that this fact is “disputed.” However, the only evidence he cites is his own affidavit, prepared well after his deposition. Edelman cannot avoid summary judgment by making factual assertions in an affidavit that are inconsistent with his prior sworn deposition testimony. See Berk v. Kronlund, 102 Mass. App. Ct. 710, 718 (2023). In other words, “a party cannot create a disputed issue of fact by the expedient of contradicting by affidavit statements previously made under oath at a deposition.” Id., quoting O'Brien v. Analog Devices, Inc., 34 Mass. App. Ct. 905, 906 (1993).
 
                                                            -13-
 
Professor Edelman instead omits many of the required elements” and “seeks to make that determination” on his own. The FRB noted that “one might expect the need for appropriate disclosures to be top of mind for Professor Edelman during this time period, given the express concern raised by the FRB about ‘the public’s trust in the independent and objective nature of [his] scholarship.’ ”
In its Addendum, the FRB noted that a goal of the School’s Conflict of Interest policy “is to ensure that faculty members provide sufficient information in publications about their outside activities and interests,” so that readers can decide for themselves whether an author has a conflict that might bias their views. It observed that, “This calls for erring on the side of disclosure and, in cases of ambiguity, seeking the input of the Dean.”
The FRB noted the contradiction between Edelman’s failure to seek guidance as to whether more fulsome disclosure of his past work for Microsoft would have been appropriate in publications that were critical of Google, and Edelman assertion that he would have added such disclosures if someone had suggested he do so. In the FRB’s words:
Because Professor Edelman did not seek input from the Dean or the Dean’s Office related to his disclosures as a means of testing his judgment—something we had hoped he might have done, especially in response to the feedback in 2015—it was not possible for anyone to suggest that such disclosure would be appropriate. Thus, we were puzzled by Professor Edelman’s statement that he would have disclosed more, “had anyone suggested that such disclosure was required or appropriate.”
Second, with respect to the American Airlines lawsuit, the FRB reported that Edelman had agreed during his interview “that there could be PR risk to Harvard.” The FRB wrote that, “given his prior history with situations that had complicated consequences for him and for the School, the FRB is concerned that he did not engage the Dean, the Dean’s Office,” or HBS’s Director of Communications “before the suit was filed.” The FRB said it remained “concerned that Professor Edelman can be quick to act on his perceptions of wrongdoing by others, without first reaching out to understand different points of view.”
1.4.3.2. Presentation of FRB Conclusions. The FRB made clear that it did not believe Edelman had met his burden of showing, through “persuasive evidence,” that he consistently upheld the School’s Community Standards.
 
                                                            -14-
 
The concluding section of the FRB’s 2017 report begins stating:
The FRB appreciates the steps Professor Edelman has taken during the last two years; clearly there are signs of effort and improvement both in his interactions with others and in his approach to outside activities and conflict of interest, as reflected back throughout the interviews with colleagues and with Professor Edelman himself. Many expressed genuine admiration for him, the work he is doing, and its impact and importance, including for the School.
But the FRB noted that others “experience Professor Edelman’s interactions as disrespectful and his work as not always meeting standards of disclosure that pose reputational risk and damage to the School, as well as to themselves as members of the School’s faculty.”
The FRB concluded its report by stating, “We therefore find ourselves unable to say, with full conviction, that the issues raised following the 2015 review have been satisfactorily resolved.”
The last paragraph of the Addendum to the FRB’s 2017 report reiterates the point. The FRB wrote, “We celebrate [Professor Edelman’s] intellect, ingenuity, drive, and commitment to making a positive difference in the world. But we also believe that how he does so matters.” And it concluded by saying, “While recognizing his many positive contributions, we struggled to find a pattern of evidence—following the findings and feedback of the 2015 review—that would allow us to say, with conviction, that the issues had been satisfactorily resolved or that he meets the School’s standards for colleagueship.”
1.4.4. The Faculty’s Votes. The Standing Committee (comprised of the tenured faculty members who had served on subcommittees formed to evaluate each tenure candidate) met in October 2017 to discuss and vote on Edelman’s tenure case. Professor Schlesinger, who was one of the members of the FRB, presented the FRB’s 2017 report to the Standing Committee. The Standing Committee also spoke with a faculty member of Edelman’s unit at HBS.
At the end of its discussion, the Standing Committee voted on whether to recommend Edelman for promotion. The Standing Committee members were equally divided, with one-half voting in favor to Edelman receiving tenure and one-half voting against. The Standing Committee is not asked to write its own report on a tenure candidate and did not do so in Edelman’s case.
The full Appointments Committee, consisting of all tenured HBS faculty members, then met in November to discuss whether to support promoting
 
                                                            -15-
 
Edelman to a tenured position. Before the meeting, the tenured faculty were given access to a file of relevant materials that included the FRB’s 2015 and 2017 reports. During the meeting, the FRB chair discussed the FRB’s review and report. When the Appointments Committee voted, 57 percent voted in favor of Edelman receiving tenure (41 out of 72 members), 40 percent were opposed (29 members), and the two other members abstained.
1.4.5. Dean Nohria’s Decision. After the vote by the Appointments Committee, Dean Nohria had broad discretion to decide whether to recommend to the University’s President that Edelman be granted tenure.
Dean Nohria reviewed all of the materials available to him as part of Edelman’s tenure review, including the Subcommittee’s report and recommendation, the FRB’s report (which included all of Edelman’s submissions as exhibits), the Standing Committee’s summary of its vote, and the Appointments Committee’s voting slips. The Standing Committee’s summary made clear that its members had reviewed and considered the FRB’s report.
Mindful that fewer than 60 percent of the Appointments Committee members voted to support giving Edelman a tenured position on the faculty, Dean Nohria asked Senior Associate Dean Healy for data on past HBS tenure votes. The data showed that from 2006 to 2017 there were six faculty tenure candidates who received favorable votes from fewer than 65 percent of the Appointments Committee, and none of them was granted tenure.
Dean Nohria decided to recommend to the President that Edelman not be promoted and receive tenure. Nohria was persuaded that Edelman easily satisfied the scholarship or intellectual standard, and that he also met the teaching standard. But Nohria concluded that Edelman had not shown that he had met and would continue to meet the HBS “collegiality standards and community standards over the long run.”[4] Without Dean Nohria’s support, Edelman’s tenure bid was denied and his employment at HBS ended.
 
--------------------------------------------
 
[4] Though Edelman asserts in responding to ¶ 106 of Harvard’s Statement of Undisputed Facts that this deposition testimony by Dean Nohria is “disputed,” the evidence cited by Edelman does not contradict this testimony. Edelman cannot defeat summary judgment by asserting that some fact is in dispute without providing evidence to back him up. See Cookson Group plc v. Flynn, 52 Mass. App. Ct. 909, 911 (2001) (“mere assertions of the existence of disputed facts  without  evidentiary  support  cannot  defeat  [a]  summary  judgment
<continued…>
 
                                                            -16-
 
The FRB’s discussion of the American Airlines and Microsoft/Google issues was an important factor in Dean Nohria’s decision not to recommend Edelman for tenure. Nohria was mindful that, in light of the BlinkX and Sichuan Garden incidents in 2014, Edelman needed to persuade the School that he now met HBS’s Community Standards, and that he had learned the importance of consulting with others at HBS before putting himself and the School in similar situations with respect to potential conflicts of interest, proper disclosure, and outside activities. Nohria concluded that Edelman seemed not to have learned that lesson, as evidenced by the manner in which he disclosed or failed to disclose potential conflicts between his work for Microsoft and his public criticism of Google without seeking guidance from others, as well as Edelman’s willingness to take on a very public lawsuit against American Airlines without consulting anyone in the Dean’s office.
In sum, Dean Nohria shared the FRB’s concerns about Edelman’s judgment and blinkered sense of collegiality—based on the BlinkX and Sichuan Garden incidents in 2014, Edelman’s inconsistent and insufficient disclosures about his relationship with Microsoft in papers about Google, and Edelman’s failure to engage with Nohria or other members of the Dean’s office before filing the American Airlines lawsuit—and concluded that those concerns were a sufficient reason to recommend against tenure.
Dean Nohria would have decided not to recommend Edelman for tenure even if the FRB’s 2017 report had not addressed any other issues about Edelman’s respect for others within HBS.[5]
* * *
2. Contract Claim. Let’s turn to the first of Edelman’s three claims for breach of contract. Harvard is entitled to summary judgment in its favor on Count I because Edelman is unable to prove any of the elements of this claim.
To prove this claim for breach of contract, Edelman must demonstrate that the FRB Procedures was a contractually binding agreement between the parties,
 
--------------------------------------------
 
motion”) (quoting Bergendahl v. Massachusetts Elec. Co., 45 Mass. App. Ct.  715, 718–719, rev. denied, 428 Mass. 1111 (1998), cert. denied, 528 U.S. 929 (1999)).
[5] Edelman says that this portion of Dean Nohria’s sworn affidavit is “disputed,” but once again the evidence that Edelman cites in response is not inconsistent with and does not refute Nohria affidavit. Edelman’s unsupported assertion cannot establish that there is any material dispute of fact. See Cookson Group, 52 Mass. App. Ct. at 911; Bergendahl, 45 Mass. App. Ct. at 718–719.
 
                                                            -17-
 
Harvard “committed a breach of that contract,” and Edelman “suffered harm as a result.” See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) (elements of breach of contract claim).
Harvard is entitled to judgment in its favor on this claim as a matter of law because Edelman has been unable to muster evidence sufficient to prove any of these elements. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991) (“If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.”) (quoting Celotex Corp. v. Catret, 477 U.S. 317, 328 (1986) [White, J., concurring]). “A nonmoving party’s failure to establish an essential element of her claim ‘renders all other facts immaterial’ and mandates summary judgment in favor of the moving party.” Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012), quoting Kourouvacilis, supra, at 711.
* *
2.1. The FRB Procedures Are Not Contractually Binding. The summary judgment record shows that Edelman cannot meet his burden of proving that Harvard was contractually bound to follow the FRB Procedures. Whether a personnel manual or policy is contractually binding “is a question of fact.” LeMaitre v. Massachusetts Turnpike Auth., 70 Mass. App. Ct. 634, 637 (2007). “Summary judgment is appropriate however, where, as here, there is ‘in essence … no real dispute as to the salient facts[.]” Id., quoting Kourouvacilis, 410 Mass. at 715–716; accord Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 9–10 (1988) (affirming summary judgment for employer on ground that personnel policy was not contractually binding).
2.1.1. No Express Contract. To begin with, Edelman has presented no evidence that could support a finding that he and Harvard expressly agreed that the FRB Procedures would be part of his employment contract.
An employer’s written policy could form the basis for an express contract if the parties explicitly agree, through offer and acceptance, that the policy establishes binding rights and obligations that will govern the employment relationship. O’Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 691 (1996).
To form a binding contract “[t]he parties must give their mutual assent by having ‘a meeting of the minds’ on the same proposition on the same terms at the same time.” I&R Mechanical, Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 455 (2004), rev. denied, 444 Mass. 1102 (2005). “The manifestation of mutual assent between contracting parties generally consists of an offer by one,”
 
                                                            -18-
 
covering all the material terms of an agreement between the parties, “and the acceptance of [that offer] by the other.” Id.
Edelman does not contend and has presented no evidence showing that Harvard ever expressly offered to make the FRB Procedures a term or condition of Edelman’s employment, or that Edelman ever expressly accepted any such offer. If there were evidence that Harvard had negotiated with Edelman and reached an agreement that all of the FRB Procedures would be followed during his tenure review, that would show that Edelman had a contractual right to enforce the policy. See O’Brien, 422 Mass. at 692. But there is no evidence and Edelman does not assert that there were any such negotiations, or that he expressly “manifested his assent” to this policy in any other way. Contrast O’Brien, supra, at 693; Jackson, 403 Mass. at 15.
2.1.2. No Contract Implied in Fact. Edelman instead contends, in substance, that the FRB Procedures created an implied contract. But the summary judgment record makes clear that he cannot prove this either.
“[I]f an employee reasonably believed” that their employer has offered to continue their employment on or subject to the terms and conditions in a written manual or policy, then “the employee’s continuing to work after receipt of the manual [or policy] would be in the nature of an acceptance of an offer of a unilateral contract” and the manual or policy would be contractually binding. O’Brien, 422 Mass. at 692–693.
In other words, “[a] contract implied in fact may be found to exist from the conduct and relations of the parties.” Jackson, 403 Mass. at 9, quoting LiDonni, Inc. v. Hart, 355 Mass. 580, 583 (1969). This principle applies generally, not only in employment cases. If one side offers to enter into a contract, and the other party performs as required and accepts benefits under the proposed contract, that constitutes acceptance of the offered terms and formation of a contract. See Polaroid Corp. v. Rollins Envt’l Servs. (NJ), Inc., 416 Mass. 684, 691 (1993).
Edelman argues that the FRB Procedures are contractually binding because “Harvard promised its faculty members that it would follow the FRB process it established” and Edelman “reasonably expected that Defendant would abide by the [FRB Procedures] as written.” The evidence presented would not permit a reasonable jury to find that Edelman has proved this element of his claim.
 
                                                            -19-
 
2.1.2.1. No Promise that the FRB Procedures Were Binding. There is no evidence that HBS ever said, or promised to its faculty, that every part of the FRB Procedures had to be followed in full in a tenure review case.
The FRB Procedures section (on page 3) that addresses “promotions, reviews, and reappointments,” and thus applies to a tenure review case, specifically refers to the Green Book standards and procedures. It refers to the “Schools criteria for ‘Effective Contributions to the HBS Community,’ ” which is the section of the Green Book that explains the School’s Community Values criterion for faculty appointments and promotions. It also states that the FRB will provide its “conclusions on whether a candidate has upheld the School’s Community Values … to the Appointments Subcommittee or Standing Committee,” and also “to the full Appointments Committee.” These are all references to procedures established in the Green Book.
Since the Green Book and the portion of the FRB Procedures relevant in tenure and other promotion cases are “interlocking documents” that are “interrelated in purpose,” any reasonable faculty member would realize that they must be read together to understand how they should be applied. See Matthews v. Planning Bd. of Gloucester, 72 Mass. App. Ct. 456, 463 (2008), quoting Striar v. American Medical Intern., Inc., 45 Mass. App. Ct. 87, 95 (1998).
Any reasonable faculty member would therefore understand that, as applied to tenure and other promotion cases, the FRB Procedures revised the Green Book procedures for faculty promotion and are subject to the explicit proviso in the Green Book that “the Dean may initiate or approve variances” from HBS procedures for faculty appointments and promotions whenever circumstances or the School’s best interest warranted it.
The express reservation of the Dean’s discretion to “initiate or approve variances” to appointment and promotion review procedures, including any portion of the FRB Procedures that could apply in tenure cases, weighs heavily against finding that the FRB Procedures were intended to be contractually binding. See Jackson, 403 Mass. at 14–15 (where employer “retained the right to modify unilaterally the personnel manual’s terms,” distribution of the manual was not an offer that could be accepted to form implied contract and employer was entitled to summary judgment); Englund v. Big Y Foods, Inc., No. 19-P-1460, 2020 WL 4047878, at *3 (Mass. App. Ct. July 13, 2020) (unpublished Rule 23.0 decision) (affirming summary judgment for employer that retained discretion to deviate from progressive discipline measures in handbook)
 
                                                            -20-
 
2.1.2.2. No Reasonable Belief the FRB Procedures Were Binding. In addition, no faculty member could have “reasonably believed” that HBS was offering to continue their employment subject to the condition that, in any future promotion case involving an FRB review, the FRB would have to follow every procedural step that Edelman now claims was violated in his case. Compare O’Brien, 422 Mass. at 692–693; see also McMillan v. Massachusetts Soc. for Prev. of Cruelty to Animals, 140 F.3d 288, 310 (1st Cir. 1998) (affirming summary judgment for employer because there was no evidence that plaintiff reasonably expected employer would apply progressive discipline policy to veterinarians).
Edelman claims that Harvard violated the section of the FRB Procedures (on page 2) under the heading “Faculty Review Board Procedure.”
Any reasonable faculty member would recognize that these provisions would apply only where a faculty member is facing possible discipline because of alleged wrongdoing, and not where a faculty member is being considered for discretionary promotion or reappointment.
The provisions cited by Edelman say they apply “where a more structured procedure may be needed to investigate a concern and determine whether misconduct has occurred.” They state that an FRB charged with investigating wrongdoing “will prepare a draft report that should include the evidence gathered; comments on the seriousness of the offense, including the FRB’s conclusions on whether misconduct has occurred; and potential recommendations for redress or remediation of the incident or behavior, including possible sanctions.” And these provisions say that, once the faculty member responds writing and the FRB submits its final report, the Dean will then be “responsible for finalizing any sanctions.”
Reasonable faculty members would understand that tenure review is not concerned with whether “misconduct” or an “offense” has occurred, and does involve any decision about whether “redress,” “remediation,” or any form of “sanctions” is appropriate. Edelman had no contractual right to receive tenure. Denial of tenure was therefore not a “sanction.”
Thus, any reasonable faculty member would conclude that this section of the FRB Procedures has nothing to do with a tenure review case or other decisions about whether to promote or reappoint a faculty member. Reasonable faculty members would also read footnote 5 to this section of the FRB Procedures as confirming that the quasi-adjudicatory procedures that Edelman claims were breached do not apply in tenure cases. That footnote says, “See the section on
 
                                                            -21-
 
‘Notes on Promotions, Reviews, and Reappointments’ for a fuller description of how conduct will be assessed when faculty members are under review by an Appointments Subcommittee or Standing Committee.”
The section about procedures to be followed in tenure and other promotion cases (on page 3) states that the FRB “may seek and report on confidential input—from faculty colleagues, staff, students, alumni, or others—about concerns about the candidate[] that were not previously reported.”
Reasonable faculty members would understand the critical importance of being able to ensure confidentiality in tenure and other promotion cases. Assuring confidentiality to those asked to critique their colleagues is necessary to “promote candor.” Vranos v. Franklin Med. Ctr., 448 Mass. 425, 433–434 (2007) (medical peer review work product and materials); accord Wakefield Teachers Ass’n v. School Committee of Wakefield, 431 Mass. 792, 802 (2000) (public school teacher disciplinary decision and report). “Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process.” United States v. Nixon, 418 U.S. 683, 705 (1974) (executive privilege).
Reasonable faculty members would therefore also understand that the requirement in the prior section that an FRB disclose all evidence that it gathers in a disciplinary case would not apply in a tenure or other promotion case, because it would be inconsistent with the FRB’s ability to protect the confidentiality of the substantive input it gathers.
Prior court decisions in which an employment policy or handbook was found or assumed to be contractually-binding concern termination of employment or analogous privileges without following promised procedures or denial of promised compensation. See Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 386–388 (2005) (medical staff bylaws promising certain procedures will be followed before hospital will terminate physician’s staff privileges); O’Brien, 422 Mass. at 691 (manual promising progressive discipline and requiring employee to follow grievance procedure to press claim of unfair treatment); LeMaitre, 70 Mass. App. Ct. at 636–643 (policy promising payment upon retirement of specified percentage of unused sick leave).
This case is different because a discretionary decision whether to grant a university professor tenure is different. “Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty
 
                                                            -22-
 
with unusually secure positions tantamount to life contracts. This security, and the freedom of expression it allows, arguably help the university carry out its basic function—the vigorous exchange of ideas—a function that itself enjoys constitutional protection.” Beitzell v. Jeffrey, 643 F.2d 870, 875 (1st Cir. 1981) (cleaned up).
This “concomitantly suggests a need for wide discretion in making an initial tenure award.” Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 269, rev. denied, 440 Mass. 1101 (2003), quoting Beitzell, supra. Unless they make a clear contractual commitment to the contrary, colleges and universities have broad discretion in deciding who should receive tenure. Id.
“Courts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgments regarding the professor’s academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement” (cleaned up). Berkowitz, 58 Mass. App. Ct. at 269, quoting Kumar v. Board of Trustees, Univ. of Mass., 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring).
Reasonable HBS faculty members, understanding the highly discretionary nature of tenure decisions, would not believe that the FRB Procedures required strict adherence to quasi-adjudicatory procedures, enforceable in court, before an FRB could provide input that may help the Dean decide whether to recommend that a faculty member be awarded tenure.
2.1.2.3. No Objection when Procedures Were Not Followed. Furthermore, it is undisputed that when the FRB reviewed Edelman’s conduct in 2015 it did not follow all of the procedures that Edelman now insists are required. It is also undisputed that Edelman was aware of that fact and did not object.
Edelman contends that Harvard breached his employment contract because the section of the FRB Procedures that speaks to disciplinary proceedings states that the FRB’s draft report “should include the evidence gathered,” and that the faculty member “will have an opportunity to review … the evidence gathered … and to respond in writing,” but the FRB never gave him the evidence it had gathered during its 2017 review so that he could respond to it. In particular, Edelman now asserts that the FRB acted improperly by not identifying all of the HBS staff and faculty members that it interviewed and by not providing Edelman with copies of any notes taken during those interviews.
 
                                                            -23-
 
But the same is true of the FRB’s review and draft report two years earlier.    In 2015, just as in 2017, the FRB conducted interviews but did not identify those people or give Edelman copies of any interview notes. Edelman could see that the draft and final FRB reports did not gather and disclose this information. Yet he never complained or objected.
This is compelling evidence that this section of the FRB Procedures did not become part of Edelman’s contract. In deciding whether an implied contract may be inferred from the parties’ conduct and relationship, “[t]here is no surer way to find out what parties meant, than to see what they have done.” T.F. v. B.L., 442 Mass. 522, 525–527 (2004), quoting Martino v. First Nat. Bank of Boston, 361 Mass. 325, 332 (1972), and Pittsfield & North Adams R.R. v. Boston & Albany R.R., 260 Mass. 390, 398 (1927).
2.1.2.4. Subjective Belief Is Not Sufficient. Edelman points to no other evidence that might convince a reasonable jury that the FRB Procedures constitute an implied contract. All Edelman is left with is his professed belief that the FRB Procedures were part of his contract with HBS.
But O’Brien holds that that whether an employment policy is an enforceable implied contract turns on an objective test, concerning whether the employee “reasonably believed” that their employer had offered to treat the policy as a term or condition of employment, not on any one employee’s subjective expectations. O’Brien, 422 Mass. at 692–693. “Reasonable belief” is an objective standard. See, e.g., Galvin v. Roxbury Community College, 497 Mass. 105, 113 (2026) (construing Massachusetts whistleblower act); Romero v. UHS of Westwood Pembroke, Inc., 72 Mass. App. Ct. 539, 541 n.3 & 542 (2008) (construing Massachusetts medical provider whistleblower statute).
Edelman’s subjective view, unsupported by other evidence, is not enough to prove that the FRB Procedures were contractually binding. Harvard is therefore entitled to summary judgment on this claim.
* *
2.2. No Breach of Contract. Even if Edelman were able to show that the FRB Procedures were contractually binding, which he cannot, Edelman’s contract claim would still fail because he has failed to muster any evidence that Harvard breached any provisions of that policy that apply to tenure review. Edelman contends that Harvard violated the FRB Procedures in six different ways. Each of these claims is based on a strained, persnickety, and incorrect reading of the FRB Procedures.
 
                                                            -24-
 
Courts must be “guided by two fundamental principles” when they interpret a university handbook or policy document that constitutes an implied contract with the school’s professors. Wortis v. Trustees of Tufts College, 493 Mass. 648, 662 (2024), quoting Berkowitz, 58 Mass. App. Ct. at 269.
First, courts must apply “the standard of reasonable expectation” and give the handbook or policy document whatever meaning that the university “should reasonably expect the other party to give it.” Wortis, supra. “In evaluating the standard of reasonable expectation,” courts must “recognize that ‘[c]ontracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is.’ ” Id. at 663, quoting Browzin v. Catholic Univ. of America, 527 F.2d 843, 848 (D.C. Cir. 1975), and Greene v. Howard Univ., 412 F.2d 1128, 1135 (D.C. Cir. 1969).
Second, courts must be “chary about interfering with academic decisions made by private colleges and universities.” Wortis, supra, at 662, quoting Berkowitz, supra. Thus, courts must avoid reading a policy regarding appointment or promotion of university faculty in a way that would constrain the tenure review process, unless the policy’s plain language would give rise to a reasonable expectation that such a result was intended. See Berkowitz, supra,  at 272 (dismissing professor’s claim that Harvard University committed breach of contract by denying him tenure without following procedures set forth in appointment handbook, because “the handbook language and structure could create no reasonable expectation to support the plaintiff’s interpretation”).
Applying these principles here, the Court concludes that Edelman has misread the FRB Procedures, and that he has not mustered evidence showing that Harvard violated any aspect of that document when it is interpreted correctly. Harvard is entitled to summary judgment for this reason. See Wortis, 493 Mass. at 668–671 (affirming summary judgment as to breach of contract claim based on reallocation of university-owned lab space, because policies that were part of tenure contract did not guarantee plaintiffs any particular lab space).
2.2.1. Reconvening the FRB. Edelman contends that Harvard violated the FRB Procedures by asking the FRB to conduct a further review in 2017 because “there was no new allegation” that he had engaged in “egregious, persistent, or pervasive misconduct.” This argument is without merit. Edelman has failed to muster evidence sufficient to establish that this was a breach of contract.
 
                                                            -25-
 
In the section that applies to promotion  cases,  the  FRB  Procedures states (on page 3) that the Dean may ask the FRB to undertake a review whenever “previous or current conduct raises a question of whether the candidate meets the School’s criteria for ‘Effective Contributions to the HBS Community.’ ”
This section makes no reference to and does not require a “new allegation.” Nor does it suggest that the Dean may not ask the FRB to conduct a review in a tenure case unless there has been an allegation of “misconduct.”
All that is needed to make FRB review appropriate in a tenure case is that past or present conduct by the candidate may call into question whether they meet HBS’s Community Standards. Dean Nohria committed no breach of contract by concluding that it was appropriate to reopen the FRB review of Edelman’s tenure case to evaluate whether Edelman had shown that he learned from and did not repeat his previous troubling conduct in the BlinkX and Sichuan Garden incidents; that was the previous conduct that convinced the Dean that further review by the FRB was warranted.
The FRB Procedures gives the Dean broad discretion in deciding whether to refer an allegation to the FRB. This document says that, “for example,” this may be appropriate where there have been “instances of egregious behavior or actions, or incidents that indicate a persistent and pervasive pattern of problematic conduct.” But the document makes clear that this is only an “example,” and that the Dean’s discretion to involve the FRB is not limited to such cases.
Nothing in the FRB Procedures indicates that the Dean may not ask the FRB to be involved in a tenure case in the absence of a “new allegation” of “egregious, persistent, or pervasive misconduct,” as Edelman contends. The language and structure of the FRB Procedures could not create any reasonable expectation among faculty members that Edelman’s contrary interpretation is correct and binding. Compare Berkowitz, 58 Mass. App. Ct. at 272.
2.2.2. Drafting an Allegation. Edelman contends that Harvard also violated the FRB procedures in a second way, because in 2017 the FRB “did not draft an allegation” that would govern the scope of its work. Edelman is unable to prove this claim for several reasons.
Since the FRB’s work in 2017 to determine whether Edelman met HBS’s Community Standards was a continuation of the review it began in 2015, nothing in the FRB Procedures required that it prepare a new allegation. When Edelman was considered for tenure in 2017, that was not a new and separate
 
                                                            -26-
 
promotion proceeding; rather, it was a continuation of the tenure case that had begun in 2015. The continued FRB review was not a new proceeding either.
In any case, the FRB provided Edelman with a clear and more than adequate description of the scope of its further review. The July 2017 letter from the FRB’s chair reminded Edelman that his tenure case had been deferred for two years to give him the opportunity to show that he had learned and grown from the BlinkX and Sichuan Garden incidents. That letter also told Edelman that, now that it had been reconvened with respect to his tenure case, the FRB planned to assess whether Edelman understood the aspects of his past conduct that were problematic, whether Edelman’s behavior had changed, and whether the School could reasonably expect that he would sustain any changed behavior.
No reasonable faculty member would understand the FRB Procedures to require a more detailed description of the scope of the FRB’s review where a tenure case was deferred due to concerns raised in an initial FRB review, was reopened a few years later, and the FRB was asked to reconvene and review the same issues regarding the same candidate.
Edelman understood full well in 2017 that the FRB was going to consider whether any of his outside activities were concerning, whether Edelman had learned to avoid the disclosure problems that arose with respect to his BlinkX blog post, and whether Edelman’s interactions with HBS staff had improved. That is why Edelman addressed all of these issues in his March 2017 submission to the FRB, as discussed above in § 1.4.1.
Edelman’s argument that this was insufficient because the FRB was required under the FRB Procedures to identify an “allegation of misconduct,” and then determine “whether misconduct has occurred,” is without merit. No reasonable faculty member would understand the FRB Procedures to require that sort of allegation to guide FRB review in a tenure case. As discussed above in § 2.1.2.2, the reference to determining “whether misconduct occurred” appears in the section of the FRB Procedures (on page 2) that applies only where a faculty member is facing possible sanctions or other discipline because of alleged wrongdoing, and not in the section (on page 3) that applies where a faculty member is being considered for tenure or some other promotion.
2.2.3. Scope of Review. Edelman contends that Harvard also violated the FRB Procedures in 2017 because the FRB impermissibly expanded the scope of its review late in the process to encompass Edelman’s outside activities and
 
                                                            -27-
 
whether his disclosure of potential conflicts of interest was adequate. Once again, Edelman has failed to muster supporting evidence.
As discussed above, the summary judgment record establishes that Edelman was well aware even before the FRB reopened its review that the FRB would be considering his outside activities and the adequacy of his disclosures. Doing what Edelman fully expected, and reviewing his activities outside the School and whether he was adequately disclosing potential conflicts in connection with his written work, was not an expansion of the scope of review.
Edelman was the one who raised his involvement in the American Airlines lawsuit, in his July 2017 submission. No reasonable faculty member would understand the FRB Procedures to bar the FRB from considering outside activities that a tenure candidate considers to be important enough to discuss in one of their submissions to the FRB.
And the FRB’s evaluation of the adequacy of Edelman’s disclosure of his work for Microsoft, in his writing about Google, was well within the scope of its review as understood by Edelman from the outset. Edelman specifically addressed his approach to disclosures in his March 2017 submission to the FRB because he understood, from the FRB’s 2015 discussion of the BlinkX incident, that this would be a central focus of the FRB’s continued investigation.
No reasonable faculty member would read the FRB Procedures as barring the FRB from considering new information about disclosure issues in Edelman’s publications that the FRB learned of during its review. “In the absence of [policy] language expressly limiting the … committee’s powers of inquiry,” courts must be “reluctant to read in restrictions that limit the university’s discretion.” Berkowitz, 58 Mass. App. Ct. at 274.
In any case, even if the FRB’s September 2017 request for more information about Edelman’s outside activities and his disclosures of potential conflicts of interests represented an expansion of the scope of review, which it did not, Prof. Edmondson made clear that the FRB was making this request only after receiving Dean Nohria’s “approval” to do so. As explained above in § 2.1.2.1, any reasonable faculty member would understand that, as applied to tenure and other promotion cases, the FRB Procedures are subject to the Green Book proviso that “the Dean may initiate or approve variances” from HBS procedures for faculty promotions whenever circumstances or the School’s best interest warranted it. Since the Dean approved the FRB’s exploration of these
 
                                                            -28-
 
issues, no reasonable faculty member would understand the scope of the FRB’s review to be in violation of the FRB Procedures.
Furthermore, the FRB’s concerns about whether and how Edelman disclosed his work for Microsoft, in connection with his writings or presentations about Google, were clearly articulated in its draft 2017 report. Edelman was given the opportunity to respond to that draft, and did so. He does not contend that the FRB blind-sided him by adding new factual findings in the final version of its report without giving him any opportunity to respond.
Edelman now complains that he was not given enough time to respond to the draft report. But when the FRB asked him to respond within eight days, Edelman did not object or ask for an extension. Since no provision of the FRB Procedures gave Edelman any contractual right to a longer response period, HBS could not have committed a breach of contract by not giving Edelman more time that he never requested. See Vakil v. Anesthesiology Assocs. of Taunton, Inc., 51 Mass. App. Ct. 114, 123 (2001) (affirming summary judgment on ground that there can be no breach of contract for not providing hearing that is not required under medical staff bylaws).
2.2.4. Non-Disclosure of Evidence. Edelman focuses his arguments on his assertion that the FRB acted improperly by not disclosing to him all evidence that it gathered about his interactions with faculty and staff, including notes from confidential witness interviews. Edelman does not argue that the FRB committed a further breach of contract by failing to disclose other evidence that concerned Edelman’s disclosures of potential conflicts (the Microsoft/Google issue) or his outside activities (the American Airlines lawsuit).[6]
 
--------------------------------------------
 
[6] The only reference in Edelman’s legal memoranda to alleged withholding of evidence other than witness interviews or emails about his interactions with faculty or staff is in a single sentence at the end of a footnote to his opposition to Harvard’s summary judgment motion.
The Court deems waived any argument that Edelman is entitled to or can avoid summary judgment because the FRB did not disclose such other evidence. In the Superior Court, parties seeking summary judgment are required by rule to file a written memorandum that includes “a statement of reasons, with supporting authorities, why the motion should be granted.” Sup. Ct. Rule 9A(a)(2). Similarly, any party opposing a summary judgment motion must submit a memorandum “that includes a statement of reasons, with supporting
<continued…>
 
                                                            -29-
 
Once again, this aspect of Edelman’s contract claim is based on a misreading of the FRB Procedures. As discussed above in § 2.1.2.2, no reasonable faculty member would understand the FRB Procedures as requiring the disclosure of information that was provided in confidence. The FRB Procedures specifically state that, whenever it becomes involved in a tenure review or other promotion or appointment case, the FRB “may seek and report on confidential input— from faculty colleagues, staff, students, alumni, or others—about concerns about the candidate[] that were not previously reported.” Any reasonable faculty member would understand that this means what it says, and that in a tenure case the FRB may and indeed must maintain the confidentiality of information provided to it in confidence.
Indeed, that is what Edelman himself understood while still an HBS professor, before he spent five years trying to come up with some basis for challenging Dean Nohria’s discretionary decision not to recommend that Edelman receive tenure. During the 2015 portion of Edelman’s tenure case, the FRB did not share with Edelman evidence it had gather in confidence through interviews and had not disclosed in its written report. Edelman knew that and did not object.
2.2.5. Reaching Conclusions. Edelman’s assertion that the FRB was required but failed to reach conclusions is also belied by the summary judgment record.
As discussed above in § 1.4.3.2, the FRB made clear in its 2017 report that it did not believe Edelman met his burden under the Green Book of showing, through “persuasive evidence,” that he consistently upheld the School’s Community Standards. The FRB concluded its report by stating, “We therefore find ourselves unable to say, with full conviction, that the issues raised following the 2015 review have been satisfactorily resolved.” And in its Addendum, the FRB added that it had “struggled” but failed “to find a pattern of evidence— following the findings and feedback of the 2015 review—that would allow us
 
--------------------------------------------
 
authorities, that the motion should not be allowed.” Id. Parties waive issues or arguments that they do not raise and develop in their written memoranda. An undeveloped assertion alluded to in a single sentence buried in a footnote does not suffice. See Ten Local Citizen Group v. New England Wind, LLC, 457 Mass. 222, 232 n.15 (2010) (issue waived because it was not properly raised in Superior Court briefing, as a “single sentence relegated to [a] footnote is not argument”); see also McCullen v. Coakley, 571 F.3d 167, 182 n.3 (1st Cir. 2009), cert. denied, 559 U.S. 1005 (2010) (“avoiding waiver” in trial court “requires more than a hint that a particular theory may be lurking; it necessitates some developed argumentation addressed to that particular theory”).
 
                                                            -30-
 
to say, with conviction, that the issues had been satisfactorily resolved or that he meets the School’s standards for colleagueship.”
No reasonable faculty member would have believed that the FRB Procedures required the FRB to go any further than this in stating its conclusions.
2.2.6. Standing Committee’s Discussion. Finally, Edelman contends that Harvard violated the FRB Procedures by permitting the Standing Committee to consider the FRB’s conclusions, even though the section that applied to tenure proceedings contemplated that the Standing Committee would not address Community Values issues reviewed by the FRB and instead leave it to the full Appointments Committee to do so in the first instance.
The Court is not persuaded by Harvard’s argument that this portion of the FRB Procedures must be referring to a different standing committee, because the tenure Standing Committee was not formed until a month after the Dean adopted the FRB Procedures. A reasonable jury could conclude that the tenure Standing Committee was contemplated when the FRB Procedures were adopted, and that a reasonable faculty member would have understood this reference to the “Standing Committee” to mean the body created a few weeks later to become part of the tenure review process.
Nonetheless, the summary judgment record establishes that HBS did not breach this provision. It is undisputed that the Dean knew the Standing Committee had been briefed on and discussed the FRB’s 2015 and 2017 reports and assessed whether Edelman met the Community Standards criterion for promotion; he had access to and reviewed the Standing Committee’s summary of its vote. By accepting and considering the Standing Committee’s vote even though he knew that this body had considered whether Edelman shown that he met HBS’s Community Standards, the Dean adequately signaled that he approved of this minor deviation from the process contemplated in the FRB Procedures, as he is entitled to do under the Green Book with respect to any and all tenure or promotion review procedures.
* *
2.3. No Proof of Harm due to the Alleged Breach. In any case, even if Edelman were able to show that the FRB Procedures were contractually binding and also that Harvard violated requirements that document imposed, which he cannot, the claim in Count I would still fail because Edelman has mustered no evidence that the Dean would have made a different decision and recommended that Edelman receive tenure if the FRB had followed different procedures.
 
                                                            -31-
 
Harvard is entitled to summary judgment because Edelman has presented no evidence, “[b]eyond indulging in pure speculation,” that things would have turned out differently if there had been no alleged breach of contract. Hasseltine House, LLC v. Jewish Fam. & Children's Servs., Inc., 106 Mass. App. Ct. 30, 36–37 (2025) (affirming summary judgment because, even if tenant operating residential treatment facility breached lease by failing to notify landlord “promptly” that anticipated vacancies triggered right to terminate, there was no evidence that earlier notice “would have enabled landlord to fill any vacancies and forestall termination”); accord Schwartz v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 682 (2001) (affirming summary judgment because plaintiff “has no reasonable expectation of proving that harm occurred as a result of any breach of contract”).
2.3.1. Burden of Proving Causation. As noted above, Edelman bears the burden of proving that he “suffered harm as a result” of Harvard’s alleged breach of contract. Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016).  In other words, he “must show ‘that any harm flowed from the breach of the contract’ ” and did not result from some other cause. Hasseltine House, supra, quoting Forlano v. Hughes, 393 Mass. 502, 508–509 (1984).
To prove causation of harm in the circumstances of this case, Edelman would have to show that Harvard’s alleged breach of contract altered Dean Nohria’s decision about Edelman’s tenure bid. Stated differently, Edelman must “present evidence showing that the breach [allegedly] committed by Harvard would have ‘changed the outcome’ ” of his tenure case. Sonoiki v. Harvard Univ., No. CV 19-12172-LTS, 2024 WL 760844, at *11 (D. Mass. Feb. 6, 2024) (Sorokin, J.) (student disciplinary case), quoting Doe v. Williams College, No. 20-30024, 2022 WL 4099273, at *16 (D. Mass. Sept. 7, 2022) (Robertson, M.J.) (same).
2.3.2. Non-Disclosure of Evidence Claim. Dean Nohria explained under oath that he decided not to recommend Edelman for tenure because he concluded that Edelman “had not met our standards for being a member of our community” and had failed to demonstrate “that we could have faith [he] would meet [our] collegiality and community standards over the long run.”
No reasonable jury could find that Nohria likely would have been persuaded to reach a different conclusion if only the FRB had ignored expectations of confidentiality, and disclosed all evidence about witness interviews, to give Edelman the opportunity to attack or criticize faculty or staff members who raised questions about whether Edelman met HBS’s Community Standards.
 
                                                            -32-
 
Dean Nohria’s testimony that he reached his conclusion because of his concerns about the BlinkX, Sichuan Gardens, American Airlines, and Microsoft/Google disclosure incidents—and that he would have come out the same way even if the FRB’s 2017 report had not addressed any other issues about Edelman’s respect for others within HBS—is unrebutted on this record.
It therefore would have made no difference if the FRB had disclosed evidence that it gathered from witnesses about how Edelman treated HBS faculty and staff. That was not the part of the FRB’s report that influenced Dean Nohria. As discussed in footnote 6 above, Edelman does not argue that the FRB withheld evidence about the American Airlines suit or Microsoft disclosures.
Edelman cannot defeat Harvard’s motion for summary judgment merely by asserting that the jury might not find Dean Nohria’s sworn testimony to be credible. See Adams v. Schneider Elec. USA, 492 Mass. 271, 287–289; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–257 (1986). “[T[] survive summary judgment,” it is not enough for Edelman to assert that Nohria “was an interested witness and thus his testimony could be disregarded;” instead, he must “identify specific material in the record that would support a jury finding” that, if the FRB had followed different procedures, then the Dean would have recommended Edelman for tenure. See Adams, 492 Mass. at 289. Edelman has failed to do so.
2.3.3. Other Alleged Breaches. There is similarly no evidence that the other alleged contract breaches by the FRB affected Dean Nohria’s decision either.
No reasonable jury could find that Dean Nohria would have changed his mind and supported Edelman for tenure if the FRB had stated its conclusions more forcefully, and been more explicit in stating that Edelman did not meet his burden of showing that he had learned and internalized lessons from the BlinkX and Sichuan Garden incidents or demonstrate that since then he had conducted himself in a manner consonant with HBS’s Community Values.
Similarly, no reasonable jury could find that the outcome would have been different if the Standing Committee had not considered Community Values, leaving only the Appointments Committee and the Dean to do so. Or if the FRB had reopened its review with a more explicit allegation outlining the questions that still lingered because of Edelman’s conduct toward BlinkX and Sichuan Garden. Or if the Dean had memorialized in writing his approval of the FRB including Edelman’s recent outside activities and disclosures within the scope of its further review.
 
                                                            -33-
 
This is not a case in which an employee claims that they were improperly fired without being given the benefit of contractually-mandated progressive discipline proceedings, as in O’Brien, 422 Mass. at 691, or that they were denied payments that were guaranteed in an employer’s written policies, as in LeMaitre, 70 Mass. App. Ct. at 636–643. In cases like that any breach of contract would lead directly to compensable harm. Not so here.
This case is different because it concerns Dean Nohria’s exercise of his broad discretion in deciding whether to recommend that Edelman receive tenure. Edelman concedes that he had no contractual right to obtain tenure.
In sum, the summary judgment record makes clear that the Dean would not have reached a different conclusion, and decided that Edelman had shown he met the School’s Community Standards and should be promoted to a tenured position, if only the FRB had gone about its work differently. Therefore, Edelman cannot meet his burden of showing that he suffered any harm as a result of Harvard’s purported breaches of contract.
* * *
3. Implied Covenant Claim. Harvard is also entitled to judgment on Count II because Edelman has not mustered any evidence that Harvard breached the implied covenant of good faith and fair dealing, or that any alleged breach of this implied covenant caused Edelman to suffer any harm as a result.
Every contract includes an implied covenant of good faith and fair dealing, which provides “that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014), quoting Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976).
Although Edelman cannot show that the FRB Procedures were contractually binding, as discussed above in § 2.1 through § 2.1.2.4, that does not dispose of his implied covenant claim. Harvard had a contractual relationship with Edelman because it agreed to employ him as an Associate Professor through June 2018. That contract includes an implied covenant of good faith and fair dealing. See Prozinski v. N.E. Real Estate, 59 Mass. App. Ct. 599, 612 n.7 (2003);
3.1. No Breach. Harvard is nonetheless entitled to summary judgment on this claim because Edelman cannot show Harvard breached this implied covenant.
“The scope of the covenant is only as broad as the contract that governs the particular relationship.” Wortis, 493 Mass. at 671, quoting Ayash, 443 Mass.
 
                                                            -34-
 
at 385. This implied covenant “does not create rights or duties beyond those the parties agreed to when they entered into the contract.” Boston Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs., 463 Mass. 447, 460 (2012), quoting Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 680 (2011).
Since Edelman has establish “no basis whatsoever” for his claim that Harvard deprived Edelman of anything required by the FRB Procedures, it follows that Harvard is entitled to judgment on the implied covenant claim. Wortis, supra.
Edelman’s contention that some of the FRB members “acted as both witnesses and adjudicators” and were biased against him is unavailing. The FRB’s involvement in a tenure review is not an adjudicatory proceeding akin to a jury trial. Nothing in the FRB Procedures bars tenured faculty members who know a tenure candidate, and may have relevant information or prior opinions about the candidate, from serving on the FRB. Compare Berkowitz, 58 Mass. App. Ct. at 272–273 (no breach of handbook merely because some ad hoc tenure review committee members were associated with alleged academic adversary). “As the ultimate decision maker” within HBS, the Dean “was not beholden” to the FRB members “or anyone else;” the Dean “was as free to consider, accept, or reject” the FRB’s “views as he was those of others inside and outside the university.” Id. at 271. Since “nothing in the contract language or purpose supports exclusion” of any of the FRB members “from participating in the tenure review process,” id., the choice of FRB members did not violate the implied covenant.
Similarly, Edelman’s disagreement with the FRB’s evaluation or presentation of information available to it, and his belief that the FRB should have conceded that Edelman’s view of the evidence was correct and their view must therefore have been wrong, cannot establish a breach of the implied covenant. Edelman says that the FRB “decontextualized” and “misleadingly excerpted” witness comments. But nothing in the FRB Procedures barred the FRB members “from using their own common sense and expertise” in evaluating the evidence that they considered. See Schaer v. Brandeis Univ., 432 Mass. 474, 480 (2000) (student disciplinary proceeding). “It is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject” in deciding whether to recommend that a faculty member receive tenure. Berkowitz, 58 Mass. App. Ct. at 274, quoting Schaer, supra, at 481.
3.2. No Resulting Harm. In any case, the implied covenant claim also fails for the reasons discussed above in § 2.3 of this decision. Harvard is entitled to summary judgment on this claim because Edelman has mustered no evidence
 
                                                            -35-
 
that any alleged breach of the implied covenant caused him to suffer harm. Hasseltine House, 106 Mass. App. Ct. at 37–38 (affirming summary judgment). Without such evidence, “the record does not show” that Edelman’s right “to receive fruits of the contract” was “ ‘destroyed or injured.’ ” Id. at 38 (cleaned up), quoting Weiler, 469 Mass. at 82. Dean Nohria made up his own mind about whether to recommend that Edelman receive tenure. No reasonable jury could find that the Dean would have supported Edelman’s tenure bid if only different faculty members had served on the FRB or they had reacted differently to arguments that Edelman made in his reply to the draft 2017 report.
* * *
4. “Promissory Estoppel” Claim. Finally, Harvard is also entitled to summary judgment on Edelman’s “promissory estoppel” claim in Count III. Edelman contends that HBS promised him that the FRB’s further review in 2017 would be governed by the FRB Procedures, Edelman relied on that promise, and Harvard breached the terms of that promise. But, for the reasons discussed above, Edelman has failed to muster evidence sufficient to prove that claim.
In the circumstances of this case, the “promissory estoppel” count adds nothing of substance to the implied contract claim in Count I. A claim for promissory estoppel is a claim that the defendant breached a contract that was formed not by an exchange of consideration but, instead, by reasonable reliance on a promise. Here, Edelman’s alleged reliance for the purposes of Count III is the same conduct that Edelman claims provided consideration for the alleged offer by HBS to strictly follow the FRB Procedures for the purposes of Count I.
“When a promise is enforceable in whole or in part by virtue of reliance, it is a ‘contract,’ and it is enforceable pursuant to a ‘traditional contract theory’ antedating the modern doctrine of consideration.” Rhode Island Hosp. Trust Nat. Bank v. Varadian, 419 Mass. 841, 849 (1995), quoting Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 760–761 (1978). “Detrimental reliance on an offer or a promise (also known as promissory estoppel) is a substitute for consideration. Therefore, an offer that reasonably induces the other party to act is enforceable as a contract in the same manner as any other contract to the extent necessary to avoid injustice.” Johnny's Oil Co. v. Eldayha, 82 Mass. App. Ct. 705, 714 (2012).
The Supreme Judicial Court has cautioned “that the term ‘promissory estoppel’ should not be used in deciding cases under this principle because that term ‘tends to confusion’ and overlooks the point that” a promise enforceable on the
 
                                                            -36-
 
basis of detrimental reliance is enforced through a claim for breach of contract. Cataldo Ambulance Serv., Inc. v. City of Chelsea, 426 Mass. 383, 386 n.6 (1998), quoting Varadian,  419 Mass. at 849, and Loranger Constr., 376 Mass. at 761.       “ ’Promissory estoppel is an equitable doctrine’ that ‘[i]n the absence of a contract in fact, ... implies a contract in law.’ ” Vacca v. Brigham & Women's Hosp., Inc., 98 Mass. App. Ct. 463, 472 (2020), quoting Malden Police Patrolman’s Ass’n v. City of Malden, 92 Mass. App. Ct. 53, 60 (2017).
Harvard is entitled to summary judgment on Count III for three reasons.
First, as discussed above in § 2.1.2.2, no reasonable faculty member would believe that the FRB Procedures were contractually binding. When a party seeks “[r]ecovery under the theory of detrimental reliance, … ‘the detrimental reliance by the party claiming estoppel must be reasonable.’ ” Johnny’s Oil,   82 Mass. App. Ct. at 715, quoting Weston Forest & Trail Assn., Inc., v. Fishman, 66 Mass. App. Ct. 654, 659 (2006). Edelman cannot show that it was reasonable for him to believe that the FRB Procedures imposed any binding requirements.
Second, as discussed above in § 2.2 through § 2.2.6, Edelman cannot show that Harvard violated the FRB Procedures. His promissory estoppel claim would fail even if Edelman could establish that he reasonably relied upon an alleged promise that Harvard would follow every part of the FRB Procedures.
Third, as discussed above in § 2.3, even if Edelman could show that Harvard committed a breach by not following the FRB Procedures, he cannot prove that Dean Nohria would likely have come to a different conclusion in the absence of the claimed breaches of contract. Since Edelman suffered no harm as a result of the alleged breaches, Harvard is entitled to judgment on this claim.
* * *
 
                                                            -37-
 
ORDERS
Defendant’s motion for summary judgment (docket no. 33) is allowed. Plaintiff’s cross-motion for partial summary judgment on Count I as to liability for breach of contract (docket no. 38) is denied.
As a result, there is no need to decide Plaintiff’s motion for sanctions for alleged spoliation of evidence (docket no. 50) or Defendant’s motion for further relief concerning Plaintiff’s consulting work relating to BlinkX (docket no. 63). These motions are therefore both denied as moot.
Final judgment shall enter in Defendant’s favor, providing that Plaintiff shall take nothing and dismissing all claims with prejudice.
/s/Kenneth W. Salinger Justice of the Superior Court
February 17, 2026